[No. E048333. Fourth Dist., Div. Two. Mar. 2, 2011.]

PATRICIA BEHR, Plaintiff and Respondent, v.
THOMAS REDMOND, Defendant and Appellant.

518

**COUNSEL**

Law Office of Robert C. Frisbee, Robert C. Frisbee; Frisbee & Bostock, Robert M. Frisbee; Greines, Martin, Stein & Richland, Kent L. Richland, Robin Meadow and Michael Anthony Brown for Defendant and Appellant.

Slovak Baron & Empey, David Baron; Payne & Fears and Paul D. Herbert for Plaintiff and Respondent.

**OPINION**

**KING, J.—**

## I. INTRODUCTION

Plaintiff and respondent Patricia Behr sued defendant and appellant Thomas Redmond for damages arising from the alleged tortious transmission of genital herpes. By special verdict, the jury made findings favorable to Behr and found that she had suffered compensatory damages of $4,003,600, including $2.5 million for future medical expenses. In a separate trial, the jury found that Behr was entitled to punitive damages in the amount of $2.75 million.

On appeal, Redmond contends (1) the evidence is insufficient to support a finding that Behr contracted the herpes virus from sexual contact with him prior to his disclosure of the disease, and that he cannot be liable for transmitting the disease after his disclosure; (2) the special verdict is fatally defective for failing to include findings as to the timing of Behr's infection, the existence of a special relationship between the parties for purposes of establishing negligent infliction of emotional distress, and any misrepresentation by Redmond; (3) the compensatory and punitive damages awards are excessive; and (4) the court erred in denying his motion to strike Behr's postjudgment request for expert witness fees.

We reject Redmond's argument concerning the sufficiency of the evidence as to his liability for transmission of herpes. We conclude he has waived his argument concerning the failure of the special verdict to include a finding regarding the timing of Behr's infection, and that his argument concerning the absence of a finding regarding a special relationship is without merit. However, we agree that the special verdict cannot support the judgment on Behr's cause of action for fraud by misrepresentation. We also agree with Redmond that the award of damages for future medical expenses is excessive,

but we reject his argument as to the award of punitive damages. Finally, we agree with Redmond that Behr is not entitled to recover her expert witness fees.

## II. FACTUAL SUMMARY AND PROCEDURAL HISTORY[1]

In 1975, Redmond learned he had genital herpes. When an outbreak of the disease occurs, blistering lesions and scabs are produced on or near the genitals. During the time relevant here, Redmond experienced approximately two outbreaks of the disease each year. He knew the disease was contagious and believed the risk of transmitting the disease to a sexual partner was high when he had an outbreak and very low—but not entirely without risk—when he had no lesions.

Redmond met Behr in May 2001 at a party at Redmond's home in Minnesota. In September 2003, they met for a lunch date in the Palm Springs area, where Behr lived. In the weeks that followed, they occasionally talked by telephone and met for dinner. The two began a sexual relationship in October 2003. Prior to having sex, Behr told Redmond that she "was free of disease." According to Behr, Redmond told her he was "healthy like I was." This discussion led her to engage in unprotected sex with Redmond.

Just prior to having sex the first time, Redmond told Behr he had a penile implant because of prostate cancer. He did not tell Behr he had herpes. From October 11, 2003, through December 13, 2003, they had sex on 10 occasions.

In February 2004, Behr traveled to Redmond's home in Scottsdale, Arizona, to be with him for the Valentine's Day weekend. On February 12, 2004, the two took a bath together. Redmond told Behr (according to Behr): " 'I need to tell you that I have herpes. I've had it for a long time, about 30 years. And I think I'm having an outbreak, so we can't have sex.' " They did not have sex that evening.

The next day, Redmond told Behr he was wrong about having an outbreak and that it was "okay" to have sex. They had sex that day and the following day, February 14, 2004.

Expert witnesses for both parties indicated that herpes can be transmitted even when the person with the virus is asymptomatic.

---

[1] In accordance with our substantial evidence standard of review, we summarize the facts in a light most favorable to the judgment, drawing all reasonable inferences and resolving all conflicts in favor of Behr. (See *Thompson v. Miller* (2003) 112 Cal.App.4th 327, 330 [4 Cal.Rptr.3d 905].)

When asked at trial why she had sex with Redmond after being told he had herpes, Behr said: "Because I trusted him. He [k]new everything there was to know about prostate cancer. He had done so much research on it. So I just thought that he would have all the answers about a disease that he had for 30 years. So I trusted him and I believed that he wouldn't hurt me. I thought he had all the answers."

At some point, Behr contracted the genital herpes virus. Behr testified she had her first outbreak in March 2004, although she did not realize it was herpes at the time. She explained that she "didn't know what was going on" and she "didn't . . . want to believe it." According to Behr's expert witness, some people who suspect they have been infected with a sexually transmitted disease respond by being in denial about the disease. Behr did not see a doctor about her symptoms.

In April 2004, Behr travelled to Spain to be with Redmond. During a 10-day period from April 8, 2004, to April 17, 2004, they had "sex mostly every night." After she returned from Spain, the two had no further sexual contact.

Behr testified she suffered a second outbreak in April 2004. In June 2004, Behr met with Natalie Rue, a nurse practitioner. Behr testified she asked to be tested "for everything" and to see if she "had any diseases." Rue, however, did not test Behr for herpes. Instead, she tested Behr for human immunodeficiency virus (HIV). The test results were negative. Behr was relieved and thought that she was "just being paranoid."

Behr testified she suffered additional herpes outbreaks in September 2004, December 2004, and February 2005. As more outbreaks occurred in the same part of her body, she began to suspect she had a disease. During the February 2005 outbreak, she went to see Rue. Rue noted a lesion on Behr's genitalia, which she described as a "recurrent lesion."[2] Test results confirmed that Behr had herpes. Behr's and Redmond's expert witnesses relied on Rue's notes in opining that the outbreak in February 2005 was likely a recurrence and that Behr had suffered previous outbreaks.

In August 2005, Behr filed a complaint against Redmond alleging, as is relevant here, causes of action for battery, intentional infliction of emotional distress, negligence, negligent infliction of emotional distress, fraud by concealment, and fraud by misrepresentation. The essence of these claims is that Redmond knew he had herpes when he and Behr had sex; Redmond initially concealed the disease from Behr; he later informed Behr of the

---

[2] Rue testified she used the word "recurrent" based on Behr's statement to her.

disease, but misrepresented that it would be safe to engage in sex; and Redmond's actions, concealment, and misrepresentations caused Behr to contract herpes and suffer damages.

The case was tried to a jury, which returned special verdicts in favor of Behr. The special verdict form returned by the jury includes the following questions (with the jury's answers in parenthesis): "Did Patricia Behr become infected with genital herpes from Thomas Redmond?" (Yes); "Did Thomas Redmond inform Patricia Behr prior to them having sexual intercourse that he was infected with genital herpes?" (No); "Was Thomas Redmond negligent?" (Yes); "Was Thomas Redmond's negligence a substantial factor in causing harm to Patricia Behr?" (Yes); "Did Patricia Behr's negligence contribute to her contraction of genital herpes?" (No).

The verdict form then called for the jury to specify the amount of damages suffered by Behr caused by the negligent transmission of genital herpes to her by Redmond. The jury responded with $3,600 for past economic loss (medical expenses); $2.5 million for future economic loss (medical expenses); $500,000 for past noneconomic loss, including physical pain and mental suffering; and $1 million for future noneconomic loss, including physical pain and mental suffering.

Next, the special verdict form included the following questions (and answers): "Did Thomas Redmond fraudulently conceal his genital herpes from Patricia Behr before he had sexual intercourse with her?" (Yes); "With regard to his sexual relationship with Patricia Behr, was Thomas Redmond's conduct outrageous?" (Yes); "Did Thomas Redmond intend to cause Patricia Behr emotional distress or act with reckless disregard of the probability that she would suffer emotional distress?" (Yes); "Did Patricia Behr suffer severe emotional distress?" (Yes); "Was Thomas Redmond's conduct a substantial factor in causing Patricia Behr's severe emotional distress?" (Yes); "Did Thomas Redmond touch Patricia Behr with the intent to harm or offend her?" (Yes); "Did Patricia Behr consent to be touched?" (No); "Was Patricia Behr harmed or offended by the touching?" (Yes); "Would a reasonable person in Patricia Behr's situation have been offended by the touching?" (Yes). With respect to these questions, the jury then set forth the same amounts of damages it had identified for the questions concerning negligence.

Finally, the jury answered "Yes" to the question whether Behr was "entitled to a judgment for punitive damages . . . ."

The issue of punitive damages was tried separately. The jury returned a special verdict setting the amount of punitive damages at $2.75 million.

Based on the special verdicts, the court entered judgment in Behr's favor and against Redmond in the amount of $6,753,600.[3]

Redmond moved for a new trial on the ground, among others, that the amount of damages awarded to Behr was excessive. The court denied the motion.

Additional facts will be discussed below where relevant to this appeal.

## III. ANALYSIS

### A. *Redmond's Duty of Care and the Sufficiency of the Evidence*

People who know or should know they have genital herpes generally have a duty to avoid sexual contact with unaffected persons or to warn potential partners before sexual contact occurs. (*Doe v. Roe* (1990) 218 Cal.App.3d 1538, 1545 [267 Cal.Rptr. 564].) Because herpes can be spread at times when there is no active outbreak, this duty exists even if the infected person limits sexual contact to times when the disease is asymptomatic. (*Id.* at pp. 1543–1545.) Although the risk of transmission of herpes during asymptomatic periods is low, it is nevertheless sufficient to support the existence of a duty of care toward prospective sexual partners in light of the strong public policy of preventing venereal disease and the small burden of warning prospective sex partners. (*Id.* at p. 1544; cf. *John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1195 [45 Cal.Rptr.3d 316, 137 P.3d 153] ["A low risk of transmission [of HIV] is insufficient to relieve the infected individual of a duty where the harm itself is great and the duty of care to prevent that harm is not onerous."].)

A person who knows or should know he or she has herpes and fails to disclose that fact, or misrepresents that he or she is disease free, may be liable for transmitting the disease to a sexual partner. (*Doe v. Roe, supra*, 218 Cal.App.3d at pp. 1541, 1543; *Kathleen K. v. Robert B.* (1984) 150 Cal.App.3d 992, 996–997 [198 Cal.Rptr. 273]; cf. *John B. v. Superior Court, supra*, 38 Cal.4th at p. 1189.) Depending upon the facts giving rise to the transmission of the disease, available tort theories may include negligence, battery, intentional infliction of emotional distress, and fraud. (*Kathleen K. v. Robert B., supra*, at pp. 993, 996–997.)

On appeal, Redmond does not dispute these general principles. Nor does he dispute the sufficiency of evidence that he and Behr had sexual contact on

---

[3] Behr's complaint included a cause of action for declaratory relief concerning title to a BMW, which Behr claimed was a gift from Redmond. The jury found in favor of Behr on this claim. Accordingly, the judgment ordered that Redmond transfer the vehicle's title to Behr.

10 occasions from October to December 2003, that he did not disclose his herpes to Behr prior to February 12, 2004, that he told Behr it was "okay" to have sex when he was not having an outbreak of the disease, or that his sexual contact with Behr infected her with genital herpes.

Redmond's primary argument on appeal has two parts. First, Redmond contends that because Behr consented to sexual contact with him after he disclosed he had herpes on February 12, 2004, he cannot be liable for the transmission of herpes to Behr that occurred after that date. Second, he argues there is no substantial evidence that the herpes virus Behr eventually contracted was from sexual contact that occurred before Redmond's disclosure. For the reasons that follow, we reject these arguments.

■ Redmond's first argument fails because although Redmond disclosed the fact he had herpes, he nevertheless told Behr it was "okay" to have sex with him because he was not then experiencing an outbreak of the disease. By telling Behr it was okay to have sex with him, Redmond implied that Behr would not get herpes if they had sex when he was not experiencing an active outbreak. This implication is strengthened by his statements the preceding day that he was " 'having an outbreak, *so we can't have sex*,' " implying that they could have sex if he was not having an outbreak. (Italics added.) Redmond admitted, however, that he was aware the virus could be transmitted in the absence of an outbreak, although he believed that the risk was "very low." The jury could easily conclude that by telling Behr it was "okay" to have sex, when he knew there was some risk she would contract the disease, Redmond negligently or intentionally misled Behr into believing there was *no* risk of getting herpes. As such, there is sufficient evidence to support the jury's findings that Redmond was negligent and fraudulently concealed from Behr the risk of contracting the disease.[4]

■ Redmond also asserts that even if Redmond concealed or misrepresented the risk of contracting herpes, there is no substantial evidence that Behr's reliance on Redmond's assurance was reasonable. We reject this argument. Fraud requires proof "that the circumstances were such as to make it reasonable for plaintiff to accept the defendant's statements without an independent inquiry or investigation." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 812, p. 1173.) Here, at the time Redmond told Behr it was okay to have sex with him, Redmond and Behr were several months into an

---

[4] One court has stated that "the three words 'I have herpes' will be sufficient in most cases to give fair notice of the danger of infection, and to fulfill the duty to use reasonable care to avoid transmitting the disease." (*R.A.P. v. B.J.P.* (Minn.Ct.App. 1988) 428 N.W.2d 103, 108, fn. omitted.) In this case, however, Redmond did not stop at this simple disclosure. He went on to assure Behr that it was nevertheless okay to have sex with him even though he knew there was some risk of transmission. This assurance distinguishes this case from "most cases."

intimate personal relationship. Behr trusted him and believed he would not hurt her. On February 12, 2004, Redmond told Behr he had had herpes for approximately 30 years and that they should not have sex because he believed he was suffering an outbreak. The next day, he informed her that he was mistaken about having an outbreak and that it was therefore okay to have sex. Redmond's unequivocal statements about the contagiousness of herpes could reasonably suggest to Behr, as she testified, that Redmond had "all the answers about [the] disease," and reaffirm Behr's belief that he cared for her and would not do something to harm her. In light of the relationship of intimacy and trust between the parties, Redmond's long experience with the disease, and his apparent knowledge about its contagiousness, the jury could reasonably conclude that Behr justifiably relied on Redmond's assurance that it was okay to have sex with him.

Because the jury could have reasonably concluded that Redmond's disclosure of herpes, *coupled with his assurance that it was okay to have sex*, constituted negligence and fraudulent concealment, it was not necessary for Behr to prove she contracted herpes as a result of sex that occurred prior to the February 12, 2004, disclosure. However, even if the jury did conclude that Behr contracted herpes as a result of sexual contact that occurred prior to February 12, 2004, we conclude the evidence was sufficient to support the verdict.

"In reviewing the sufficiency of evidence on appeal, we resolve all conflicts in favor of the prevailing party and we indulge all legitimate and reasonable inferences to uphold the verdict if possible. 'It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. . . .' [Citation.]" (*Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1043 [75 Cal.Rptr.2d 777].) " '[W]e have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' [Citations.]" (*Leff v. Gunter* (1983) 33 Cal.3d 508, 518 [189 Cal.Rptr. 377, 658 P.2d 740].)

Behr testified she had her first outbreak of herpes in March 2004. This was approximately five months after Behr and Redmond began having sex and approximately three months after the last time they had sex prior to Redmond's February 12, 2004, disclosure of herpes. Her expert witness testified that the average time for an initial outbreak of herpes in women usually occurs between 30 and 90 days after infection. However, he added

that it might not occur for "upwards to a year afterward." Although Redmond's expert witness testified that an initial outbreak usually occurs within seven to 21 days after infection, he also stated that the virus could remain dormant after infection, remain in the infected person's system, then become active after "years and years." Behr's expert's testimony that the initial outbreak could occur up to one year after infection, and Redmond's expert's testimony regarding activation after a long period of dormancy, provide ample support for a conclusion that Behr's March 2004 outbreak of herpes was caused by sexual contact with Redmond between October and December 2003.

Redmond contends that Behr's testimony that she suffered her initial outbreak in March 2004 does not constitute substantial evidence of such an outbreak. He points to the absence of any reference to herpes in her medical records prior to February 2005. Indeed, there is no record of any medical test or diagnosis prior to February 2005 indicating that she had herpes. However, although the medical records do not provide evidence confirming that Behr had herpes prior to February 2005, the absence of such evidence does not negate or even contradict her testimony. There is no medical record concerning the March 2004 outbreak because Behr did not see a doctor about that outbreak. Although the failure to seek treatment arguably affects the credibility of Behr's testimony about a March 2004 outbreak, the failure may also have been the result of being in denial about contracting the disease, as suggested by her expert witness. As Behr testified, she "didn't . . . want to believe it" at that time. In short, although the absence of medical evidence confirming Behr's March 2004 outbreak may affect the weight the jury accorded her testimony, it does not render the testimony without substance.

Redmond further asserts that Behr's testimony of her March 2004 herpes outbreak is not substantial evidence of an outbreak of herpes because Behr is not qualified to diagnose herself with a disease. Behr is not, as Redmond points out, a doctor. We reject this argument.

 Initially, we observe that Redmond's counsel did not object to Behr's testimony as improper opinion evidence or on any other ground. Any challenge to the admissibility of the evidence was therefore waived. (See *Jaramillo v. State Bd. for Geologists & Geophysicists* (2006) 136 Cal.App.4th 880, 893 [39 Cal.Rptr.3d 170].) Moreover, lay witnesses are generally competent to testify as to their own knowledge of their diseases, injuries, or physical condition. (See 1 Witkin, Cal. Evidence (4th ed. 2000) Opinion Evidence, § 13, p. 542; Evid. Code, § 800, subd. (a).) There is no dispute that Behr has been diagnosed as having genital herpes. We have no doubt that a person who suffers from genital herpes is competent to testify as to when he or she had an outbreak of the disease. (See *Frederick v. Federal Life Ins. Co.*

(1936) 13 Cal.App.2d 585, 590 [57 P.2d 235] [witness may testify whether he has had gonorrhea].) Indeed, Redmond testified about his own outbreaks of the disease without the need for expert testimony.

The fact that Behr's perception that the March 2004 event was a herpes outbreak was not formed until after she was diagnosed with the disease does not necessarily invalidate the perception or render her testimony entirely without substance. It is entirely possible that symptoms of herpes might not be recognized as such by the herpes sufferer when they first appear, but can, with the benefit of hindsight and a subsequent diagnosis, be accurately perceived as an outbreak.

Finally, Redmond argues that Behr's testimony regarding the March 2004 outbreak is not consistent with the symptoms of herpes. The argument is without merit. Significantly, Behr was never asked at trial to describe, and did not describe, the symptoms of her March 2004 outbreak. She testified to the fact of having an outbreak in March 2004 and Redmond's counsel never inquired of the nature of the outbreak or her symptoms. Redmond relies instead upon Behr's testimony regarding symptoms in February 2005, not March 2004. Moreover, Redmond ignores the testimony of Behr's medical expert, who said that Behr described the March 2004 outbreak to him as including a blistered, genital lesion, which is consistent with the expert's testimony regarding herpes symptoms.

## B. *Waiver of Argument That Special Verdict Omitted Question Concerning the Timing of Behr's Infection*

Redmond argues the judgment must be reversed because the special verdict form was ambiguous as to when Behr contracted herpes from Redmond; that is, it fails to specify whether the infection occurred before or after his February 12, 2004, disclosure. Instead, the jury was asked generally whether Behr became infected with genital herpes from Redmond, without any reference to the timing of the infection.

Initially, we note the failure to specify the timing of the infection appears to be significant only if Behr was required to prove she contracted herpes prior to the February 12, 2004, disclosure. As we explained above, however, the evidence was sufficient to find Redmond breached his duty of care toward Behr, and that he concealed the risk of contagion, regardless of when he transmitted the virus. Contrary to Redmond's assertion, Redmond could still be liable for a postdisclosure infection under the circumstances in this case because, after disclosing the disease, he told Behr it would be okay to have sex.

In addition, we agree with Behr that Redmond has waived this alleged defect in the special verdict form. The rules are well settled. " 'If the

verdict is ambiguous the party adversely affected should request a more formal and certain verdict. Then, if the trial judge has any doubts on the subject, he may send the jury out, under proper instructions, to correct the informal or insufficient verdict.' [Citations.]" (*Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456 [72 Cal.Rptr. 217, 445 P.2d 881].) A party who fails to object to a special verdict form ordinarily waives any objection to the form. (*Lynch v. Birdwell* (1955) 44 Cal.2d 839, 851 [285 P.2d 919]; *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131 [41 Cal.Rptr.2d 295].) However, waiver is not automatic, and there are many exceptions. (*Woodcock v. Fontana Scaffolding & Equip. Co., supra*, at p. 456, fn. 2.) For example, "[w]aiver is not found where the record indicates that the failure to object was not the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy.' [Citations.]" (*Ibid.*) Nor is an objection required when the verdict is fatally inconsistent. (*Morris v. McCauley's Quality Transmission Service* (1976) 60 Cal.App.3d 964, 972 [132 Cal.Rptr. 37].)

Although Behr, as the plaintiff, was responsible for having a verdict form submitted to the jury on her case (see, e.g., *Amerigraphics, Inc. v. Mercury Casualty Co.* (2010) 182 Cal.App.4th 1538, 1557 [107 Cal.Rptr.3d 307]), it was Redmond who believed that the timing of the infection was important to determining liability or the absence thereof. It was thus incumbent on him to see that findings regarding the timing of the infection were included in the verdict. (See *Moore v. Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 746 [223 Cal.Rptr. 859].)

Redmond had the opportunity to ensure that such questions were included. According to Behr, Redmond's counsel actually prepared the verdict form. Although the record is not perfectly clear on this point, Redmond does not deny this assertion and concedes that both parties stipulated to the form and that "[t]he stipulation is tantamount to both parties having drafted the special verdict." As, at least, a codrafter of the form, Redmond clearly had the opportunity to include questions regarding the timing of the infection that he now considers "crucial." Not only did he not do so, he failed to seek any correction or clarification of the verdict at any time, even though the jury was polled regarding the verdict and was not discharged until after the verdict was returned on the punitive damages phase two days later. In light of Redmond's purported interest in the omitted questions, his counsel's involvement in drafting the verdict, and his failure to clarify or correct the verdict despite ample opportunity to do so, we conclude he has waived any objection to the failure of the verdict form to specify whether the infection occurred before or after the February 12, 2004, disclosure.

C. *Special Verdict Does Not Support Judgment for Fraud by Misrepresentation*

Redmond also contends the judgment on Behr's cause of action for fraud by misrepresentation must be reversed because it is not supported by the special verdict form. We agree.

Behr's complaint includes separate causes of action for fraud by concealment and fraud by misrepresentation. The fifth cause of action for fraud by concealment was based on Redmond's alleged failure to disclose his herpes to Behr. The sixth cause of action for fraud by misrepresentation was based on allegations that Redmond misrepresented to Behr that she could not be infected with herpes if he was not having an outbreak of the disease at the time of sexual contact. As Redmond points out, the special verdict form called for the jury to make a finding as to whether Redmond "fraudulently conceal[ed]" his genital herpes from Behr, but did not call for a finding (and the jury did not make any finding) as to whether Redmond made any affirmative misrepresentation. Nevertheless, the court entered judgment in Behr's favor on both the fifth and sixth causes of action.

■ When a special verdict is used and there is no general verdict, we will not imply findings in favor of the prevailing party. (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 285 [73 Cal.Rptr.2d 596].) If a fact necessary to support a cause of action is not included in such a special verdict, judgment on that cause of action cannot stand. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325–327 [71 Cal.Rptr.3d 469].) Because a cause of action for fraudulent misrepresentation requires a finding that the defendant made a misrepresentation, the absence of such a finding precludes judgment for the plaintiff on that claim.

The waiver rules discussed in the preceding part do not apply here. The failure to include a finding on the fact of misrepresentation is not an ambiguity that needed clarification; it is simply the absence of a factual finding necessary to support a cause of action. Like the defendant in *Saxena*, Redmond "is not challenging the special verdict form as such. He merely argues the verdict form submitted by plaintiff[], and the verdict returned by the jury, does not support entry of judgment on a . . . theory" asserted in the complaint. (*Saxena v. Goffney, supra,* 159 Cal.App.4th at p. 327.) As mentioned above, Behr, as the plaintiff, had responsibility for submitting a verdict form sufficient to support her causes of action. (See, e.g., *Amerigraphics, Inc. v. Mercury Casualty Co., supra,* 182 Cal.App.4th at p. 1557.) If she chose not to include a proposed factual finding essential to

one of her claims, it is not incumbent on Redmond, as the defendant, to make sure the omission is cured.[5]

■ Redmond makes a similar argument as to Behr's negligent infliction of emotional distress claim. He asserts the judgment on this cause of action cannot stand because the special verdict did not include a finding that he and Behr had a "special relationship" and such a finding is necessary to support the cause of action. We reject this argument. Negligent infliction of emotional distress is not an independent tort; the tort is negligence. (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001 [25 Cal.Rptr.2d 550, 863 P.2d 795]; *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1045 [90 Cal.Rptr.3d 453].) ■ A cause of action for negligence requires the plaintiff to prove the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, causation, and damages. (*Huggins v. Longs Drug Stores California, Inc.* (1993) 6 Cal.4th 124, 129 [24 Cal.Rptr.2d 587, 862 P.2d 148].) Although the existence of a duty in some cases may require proof of a special relationship between the parties, it is not required when there is another basis for imposing such a duty. (See *Potter v. Firestone Tire & Rubber Co., supra,* at pp. 984–985; *Wooden v. Raveling* (1998) 61 Cal.App.4th 1035, 1038–1046 [71 Cal.Rptr.2d 891].) Here, the existence of Redmond's duty of care (as a person infected with genital herpes) toward Behr (his sexual partner) is established by law. (See *Doe v. Roe, supra,* 218 Cal.App.3d at p. 1545; *Kathleen K. v. Robert B., supra,* 150 Cal.App.3d at pp. 996–997.) A finding that Behr and Redmond had a special relationship, therefore, was not required to establish the existence of a duty or Redmond's liability for negligence.

## D. *Compensatory and Punitive Damages Awards*

In addition to awarding $3,600 for Behr's past medical expenses, $500,000 for past noneconomic loss, and $1 million for future noneconomic loss, Behr was awarded $2.5 million for future medical expenses. Redmond challenged the award for future medical expenses in his motion for new trial. The trial court rejected the argument. On appeal, Redmond argues that the award is unsupported by substantial evidence and should be reduced to no more than $72,000—the approximate cost of certain prescription medication for the remainder of Behr's life expectancy. If this is done, he argues further, the punitive damages award will be "rendered 'suspect' and must also be

---

[5] Although the judgment must be modified to reflect judgment in Redmond's favor on the sixth cause of action for fraud by misrepresentation, this modification does not affect Redmond's liability on other claims or the amount of damages awarded by the jury. The amount of damages awarded to Behr is based on the jury's determination of damages caused by Redmond's negligence, fraudulent concealment, and other tortious conduct without regard to any misrepresentation.

reversed for determination anew." We agree with his argument regarding future medical expenses and reject the argument regarding punitive damages.

 The measure of damages for torts is generally "the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ. Code, § 3333.) An award of damages may include an amount for detriment that is "certain to result in the future." (*Id.*, § 3283.) However, the "requirement of certainty . . . cannot be strictly applied where prospective damages are sought, because probabilities are really the basis for the award." (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1552, p. 1027.) Still, " ' "there must be evidence to show such a degree of probability of their occurring as amounts to a reasonable certainty that they will result from the original injury." [Citations.]' " (*Bellman v. San Francisco H. S. Dist.* (1938) 11 Cal.2d 576, 588 [81 P.2d 894].)

 "The measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier of fact." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 65, fn. 12 [118 Cal.Rptr. 184, 529 P.2d 608].) When, however, the evidence is insufficient to establish that alleged prospective damages are reasonably certain to occur, a jury's award of such damages cannot be sustained on appeal. (*Green Wood Industrial Co. v. Forceman Internat. Development Group, Inc.* (2007) 156 Cal.App.4th 766, 776–778 [67 Cal.Rptr.3d 624].) When the evidence is sufficient to sustain some but not all alleged damages, we will reduce the judgment to the amount supported by the evidence. (*Id.* at pp. 778–779; *Mendoza v. Rudolf* (1956) 140 Cal.App.2d 633, 637–638 [295 P.2d 445].)

In support of her claim for future medical damages, Behr argues that she is "uninsurable" because of her herpes and that her prescription medication will cost her $93,600.[6] The evidence regarding her uninsurability consists of Behr's testimony that she applied for health insurance on one occasion and was told her application was denied because she had herpes. The denial, she points out, precludes "*all* medical coverage, not merely . . . coverage for care and treatment of conditions related to her genital herpes." The argument appears to assume that she will incur medical expenses over her life that would be covered by an insurance policy and exceed the cost of her insurance premiums. We reject this argument.

---

[6] At trial, Behr's counsel argued: "You also heard testimony about how expensive the medication is. It's almost $5,000 a year to take it every day, as she does to minimize the outbreaks, to minimize the pain that is associated with the outbreaks. You heard her testify that she was denied health insurance coverage as a result of her diagnosis with herpes and her prescription for Valtrex. That means that every single visit, every physical, every Pap smear, every breast exam, every urgent care visit, she has to pay for on her own for the remainder of her life. Her mother is 95. It's entirely likely that she has a good 35 years left."

Even if we assume that evidence of the denial of one application for health insurance was sufficient to establish that Behr was uninsurable, the absence of insurance is not itself a future medical expense. Here, there was no evidence that she would need any future medical care of any kind other than her herpes medication (which is addressed below). Nor was there evidence of the cost of health insurance, the cost of medical procedures she might encounter, or the extent to which an insurance policy would be expected to cover such costs. In short, to the extent the jury's award of future medical expenses was based on Behr's purported uninsurability, it is unsupported by any evidence whatsoever that Behr has suffered any detriment.

Regarding the expense for prescription medicine, Behr testified she was taking the medication Valtrex to control the disease. According to her medical expert, "Valtrex usually works when taken for long periods of time." Redmond's expert stated that Valtrex "suppresses the herpes virus and suppresses the replication of herpes virus." Behr had not had an outbreak of the disease while taking the medication. There was evidence that a one-month supply of Valtrex costs $200.

Redmond does not dispute the sufficiency of the evidence of the cost of Valtrex or that Behr can recover, as a future medical expense, an amount equal to the expected cost of the medication over her remaining life. Behr was 56 years old at the time of trial. Redmond points out that Behr offered no competent evidence of her life expectancy. Instead, her counsel referred the jury to Behr's testimony that Behr's mother was 95 years old and, based on that fact, argued that "[i]t's entirely likely that she has a good 35 years left." We agree with Redmond that Behr's testimony of her mother's age, without more, is insufficient to support a jury's determination of Behr's remaining life expectancy.

Redmond does not argue that the failure of proof of life expectancy prevents Behr from recovering *any* amount for her prescription medication; instead, he asserts that Behr should be limited to the cost of the medication over her remaining life as indicated in a life expectancy table included in CACI jury instructions. (See Judicial Council of Cal., Civ. Jury Instns. (2010) Life Expectancy Table—Female, p. 901.) As shown in this table, the life expectancy of a woman of Behr's age at the time of trial is 27.4 years.[7] (*Ibid.*) Based on the cost of the medication and this life expectancy, Redmond

---

[7] The information in the CACI life expectancy table is judicially noticeable under Evidence Code section 452, subdivision (h). Redmond's reliance on the table in his opening brief implies a request that we take judicial notice of the information. Although Behr argues that her reference to her 95-year-old mother supports the jury's award, she does not challenge Redmond's reliance on the CACI life expectancy table on evidentiary grounds. Accordingly, we may, and do, take judicial notice of the facts set forth in the table. (Evid. Code, §§ 452, subd. (h), 459, subd. (a).)

calculates that the proven future medical expenses are no more than $65,760. Nevertheless, Redmond requests that we reduce the award of future medical expenses to $72,000.

We agree with Redmond.[8] Damages for Behr's future medical expenses is supported only by the evidence of the cost of Behr's medication over her expected lifespan. This amount is no more than the $72,000 requested by Redmond. We will therefore modify the judgment to reduce the award accordingly.

Although we agree with Redmond regarding compensatory damages, we reject his argument regarding punitive damages.

 "In a civil case not arising from the breach of a contractual obligation, the jury may award punitive damages 'where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.' (Civ. Code, § 3294, subd. (a).)" (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712 [101 Cal.Rptr.3d 773, 219 P.3d 749].) "Under California law, a punitive damages award must be based on three factors: (1) the reprehensibility of the defendant's conduct; (2) the amount of compensatory damages awarded to or actual harm suffered by the plaintiff; and (3) the defendant's financial condition." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 690, fn. 18 [71 Cal.Rptr.3d 775]; see BAJI No. 14.71 (9th ed. 2002).)

 Generally, punitive damages awards are reviewed under the substantial evidence standard of review "in which all presumptions favor the trial court's findings and we view the record in the light most favorable to the judgment." (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 916 [52 Cal.Rptr.3d 126].) We are also "guided by the 'historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice. . . .' [Citation.]" (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 927 [148 Cal.Rptr. 389, 582 P.2d 980].) Stated differently, "[a]n appellate court may reverse an award of punitive damages only if the award appears excessive as a matter of law or is so grossly disproportionate to the ability to pay as to raise a presumption that it was the result of passion or prejudice." (*Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 583 [107 Cal.Rptr.2d 308], citing *Neal v. Farmers Ins. Exchange, supra*, at p. 928.)

 Redmond does not challenge the jury's finding that Behr was entitled to an award of punitive damages or argue that the evidence was

---

[8] At oral argument, Behr did not dispute our analysis of the future medical damages issues.

insufficient to establish the requisite oppression, fraud, or malice. And, although punitive damages awards are subject to constitutional limits (see, e.g., *Roby v. McKesson Corp., supra,* 47 Cal.4th at p. 712; *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416–418 [155 L.Ed.2d 585, 123 S.Ct. 1513]), Redmond does not contend that such limits were exceeded in this case. Nor does Redmond dispute the sufficiency of the evidence of the reprehensibility of his conduct or assert that the jury's award is disproportionate to his ability to pay. Instead, Redmond argues that when, as here, "a jury's mistake about the amount of recoverable compensatory damages requires reversal of such an award, an accompanying punitive damages award is rendered 'suspect' and must be also reversed for determination anew." He relies on *Krusi v. Bear, Stearns & Co.* (1983) 144 Cal.App.3d 664 [192 Cal.Rptr. 793] (*Krusi*) and *Auerbach v. Great Western Bank* (1999) 74 Cal.App.4th 1172 [88 Cal.Rptr.2d 718] (*Auerbach*).

In *Krusi,* a jury awarded the plaintiffs $58,940 in compensatory damages and $50,000 in punitive damages. (*Krusi, supra,* 144 Cal.App.3d at p. 672.) The trial court reduced the compensatory award by $30,000. (*Ibid.*) The Court of Appeal reversed and remanded with directions for the trial court to consider whether certain payments should be applied as an offset to further reduce the award of compensatory damages. (*Id.* at pp. 672–678.) The court further instructed the trial court, "after it has determined the proper amount to offsets to the compensatory damage award, [to] consider whether there should be a reduction in the amount of punitive damages. If a reduction is determined to be appropriate, the trial court may wish to order a remission of a portion of the punitive damages as a condition to an order granting a new trial." (*Id.* at p. 681.)

In *Auerbach,* a jury found the defendant bank liable on contract and fraud claims and awarded the plaintiff $207,155 on each claim. (*Auerbach, supra,* 74 Cal.App.4th at p. 1184.) The jury also awarded $2.6 million in punitive damages. (*Ibid.*) The Court of Appeal held that the recoverable compensatory damages on the fraud claim were limited to $6,750. (*Id.* at pp. 1189, 1192.) The court then addressed the punitive damages award, stating: "We cannot, however, simply reduce the damages and modify the award on the fraud cause of action at this stage. Because the jury was misled about the amount of compensatory damages it could award, its punitive damage award is suspect. Although there is no fixed ratio, punitive damages must be proportional to recoverable compensatory damages. [Citation.] Because the punitive damages are out of proportion to the actual damages suffered by the [plaintiffs], the punitive damage claim will have to be retried." (*Id.* at p. 1190.)

Neither *Auerbach* nor *Krusi* stands for the proposition that an award of punitive damages must be reversed and retried whenever the Court of Appeal

reduces an award of compensatory damages. *Krusi* merely holds that when the trial court is directed to reconsider the award of compensatory damages, it "may wish to" reduce the award of punitive damages as a condition of granting a new trial. *Auerbach* is also distinguishable. In that case, the ratio of the jury's punitive damages award to the compensatory damages after the Court of Appeal's reduction was 385 to one. Although the *Auerbach* court did not expressly rely on constitutional standards in reversing the punitive damages award, it is clear that such a grossly disproportionate award could not withstand constitutional scrutiny. (See *State Farm Mut. Automobile Ins. Co. v. Campbell, supra,* 538 U.S. at p. 425 ["few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process"].) Here, by contrast, the ratio of punitive damages to compensatory damages (after our reduction) is 1.75 to one. Although this is higher than the ratio that would exist if the jury's compensatory award was allowed to stand, it is not so disproportionate as to render it "suspect" or to otherwise require reversal.

In the absence of any challenge to the sufficiency of the evidence or the constitutionality of the punitive damages award, and having rejected the ground asserted by Redmond, we will not disturb the award.

In a petition for rehearing, Redmond contends the punitive damages award is constitutionally excessive and argues that he has not waived the argument when he failed to assert it in his opening brief. We hold that the argument has been waived. In his opening brief, Redmond's entire argument concerning the punitive damages award consists of the following two sentences and citations: "Punitive damages 'must be proportional to recoverable compensatory damages.' (*Auerbach*[, *supra,*] 74 Cal.App.4th [at p.] 1190 . . . .) Accordingly, where, as here, a jury's mistake about the amount of recoverable compensatory damages requires reversal of such an award, an accompanying punitive damages award is rendered 'suspect' and must be [*sic*] also be reversed for determination anew. (*Ibid.*; see also *Krusi*[, *supra,*] 144 Cal.App.3d [at pp.] 680–681 . . . .)" Neither *Auerbach* nor *Krusi* discussed the constitutionality of punitive damages awards.

In his petition, Redmond now contends that his failure to assert a constitutional argument "was true only as to the *original* judgment" and that he "has never before had an opportunity to brief the question of whether the $2.75 million punitive award assessed against him is constitutionally excessive when measured against the reduced compensatory award." The argument is disingenuous.

Redmond's argument in his opening brief as to the "suspect" nature of the punitive damages award is predicated upon his assumption that we would

agree with his argument to reduce the compensatory damages award; that is, the punitive damages award was "suspect," Redmond argued, because of the "jury's mistake about the amount of recoverable compensatory damages." Thus, his punitive damages argument anticipated and assumed that we would reduce the compensatory damages award as he requested. It is this assumption that provided him with the opportunity to argue that the punitive damages award was suspect and reversible under *Auerbach* and *Krusi.*

Redmond simply cannot logically or fairly argue that his argument as to the suspect nature of the award was properly asserted while a constitutional argument would have been premature. Just as he had the opportunity to argue, and did argue, that the reduction of compensatory damages rendered the punitive damages award suspect, he had the opportunity to argue that the same reduction rendered the award unconstitutional. Yet he elected to raise only the former argument and forego the latter. Accordingly, his failure to brief the constitutional issue constitutes a waiver or abandonment of the issue on appeal. (See *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1345–1346, fn. 6 [100 Cal.Rptr.2d 446]; *Wurzl v. Holloway* (1996) 46 Cal.App.4th 1740, 1754, fn. 1 [54 Cal.Rptr.2d 512].)

E. *Award of Expert Witness Fees*

Following trial, Behr filed a memorandum of costs in which she sought $12,865 in expert witness fees. The court denied Redmond's motion to strike the request for expert fees. On appeal, Redmond contends the court's ruling was error. Behr does not dispute this issue.

Behr relied on Code of Civil Procedure section 998 to support her claim for recovering expert witness fees. Although this statute does permit the recovery of expert witness fees when a plaintiff serves a written offer to compromise, the defendant does not accept the offer, and the defendant fails to obtain a more favorable judgment (Code Civ. Proc., § 998, subds. (b), (d)), as Redmond points out, Behr failed to support her memorandum of costs with a written offer to compromise. Accordingly, the award of expert witness fees must be reversed.

## IV. DISPOSITION

The judgment is reversed as to the sixth cause of action for fraud by misrepresentation. The award of future medical expenses is reduced to $72,000, and the total compensatory damages award is reduced to

$1,575,600. The court's order denying Redmond's motion to strike or tax costs is modified, such that the motion to strike costs associated with expert witness fees is granted. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

Hollenhorst, Acting P. J., and McKinster, J., concurred.

On March 25, 2011, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 22, 2011, S192548.