Filed 1/22/16  Busalacchi v. Browning CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MARIE BUSALACCHI, <br><br>      Plaintiff and Respondent, <br><br> v. <br><br> JEFFREY P. BROWNING et al., <br><br>      Defendants and Appellants. | A141110 <br><br> (San Francisco City & County <br>  Super. Ct. No. CGC-11-514310) |

INTRODUCTION

Plaintiff Marie Busalacchi was driving in stop-and-go traffic on the Embarcadero in San Francisco when she was rear-ended by an Acme Yellow LLC taxicab driven by defendant Fermino Rodrigues.  Although the collision was relatively minor, Busalacchi suffered serious injuries, including subdural hematomas and seizures, and can no longer drive or live independently.  A jury awarded her approximately $1.3 million in damages, and the trial court found alter ego liability on the part of defendants Jeffrey P. Browning and Param Dhillon.  Only Browning and Dhillon appeal, claiming the trial court made numerous errors, including evidentiary and instructional errors and in finding that the evidence supports alter ego liability.  We affirm.

BACKGROUND

Rodrigues was following two to three feet behind Busalacchi in heavy traffic, when she stopped and Rodrigues ran into her.  Busalacchi then hit the car in front of her.

Busalacchi, 80 years old at the time of the accident, hit her head on the steering wheel.  After developing a tennis-ball-sized lump on her forehead, she was taken to San

1

Francisco General Hospital and diagnosed with two subdural hematomas. Doctors performed a craniotomy, removing a portion of her skull, to relieve the pressure on her brain. Following the surgery, Busalacchi suffered seizures and required medication. Her physicians prohibited her from driving. She was living independently before the accident, but now must live in an assisted-living facility.

After Rodrigues failed to answer Busalacchi's complaint, his default was entered. At the outset of trial, he made a motion to set aside the default, which was denied for a number of reasons, including the fact that the motion was made more than six months after entry of his default.

The parties thereafter agreed Rodrigues's negligence was not "going to be a factor given the Court's ruling." Accordingly, the special verdict form was premarked with an affirmative answer to the question "Was Fermino Rodrigues negligent in operating the vehicle?"

The remainder of the special verdict form, except as to the amount of damages, was focused on Busalacchi's negligent entrustment claims and respondeat superior claims. As to Busalacchi's negligent entrustment claims, the jury found that Acme owned or had possession of the vehicle driven by Rodrigues and knew or should have known Rodrigues was "incompetent or unfit to drive," but nevertheless permitted him to drive. It also found that Browning and Dhillon owned or had possession of the vehicle, knew Rodrigues was incompetent or unfit to drive, and permitted Rodrigues to drive the vehicle. However, the jury found Rodrigues's incompetence or unfitness to drive was not a substantial factor in causing harm to Busalacchi. Thus, defendants were successful on the negligent entrustment claims. As to vicarious liability, the jury found that Rodrigues was an employee of Acme, but not of Browning or Dhillon, and was acting within the scope of his employment when he harmed Busalacchi. Accordingly, Browning and Dhillon, but not Acme, were also successful on these claims.

The jury went on to find that Busalacchi sustained $1,373,865.52 in damages ($299,511.52 in past economic damages, $474,354 in future economic damages, $300,000 in past noneconomic losses, and $300,000 in future noneconomic losses). On

2

stipulation of the parties, the court reduced the total economic damages to $761,901.52 to reflect the present value of the future economic damages.

The court then conducted a bench trial on Browning and Dhillon's alter ego liability. Although Dhillon's wife, Amandeep Kaur, and Browning were the only named "members" in the "LLC Operating Agreement of Acme Yellow LLC,"[1] the court found that Dhillon "actually used Ms. Kaur as a sham" and was also an owner of the business. Applying the alter ego factors set forth in *Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, the court also found, among other things, that the business was inadequately capitalized, normal business formalities were not followed, business funds were diverted, and a substantial amount of cash income was never reported to the Internal Revenue Service. The court concluded "[t]his case cries out for the alter ego . . . doctrine . . . to apply" and found "that really the use of the LLC is just a shell to shield these individuals from liability."

DISCUSSION

*Rodrigues's Negligence*

Browning and Dhillon claim the trial court erred "when it took the question of Mr. Rodrigues's negligence away from the jury." (Solid capital letters and boldface omitted.) While recognizing there is no issue of negligence as to Rodrigues himself, they rely on authority that a default against one party is not binding on other parties. They also maintain the special verdict is fatally defective even as to Rodrigues because it did not include questions on all elements of a negligence claim. They thus contend they are not barred from attacking the judgment on either invited error or waiver grounds, regardless of what they said or did in the trial court. We have no trouble concluding the instant record supports the negligence judgment against defendants.

Browning and Dhillon do not challenge the propriety of the default against Rodrigues. A defendant, like Rodrigues, who fails to answer admits all well pleaded facts. " ' "[T]he judgment by default is said to 'confess' the material facts alleged by the

---

[1] Kaur was not named as a defendant.

3

plaintiff, i.e., the defendant's failure to answer has the same effect as an express admission of the matters well pleaded in the complaint." ' [Citation.] The 'well-pleaded allegations' of a complaint refer to ' " 'all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' " ' [Citations.] [¶] 'Because the default confesses those properly pleaded facts, a plaintiff has no responsibility to provide the court with sufficient evidence to prove them—they are treated as true for purposes of obtaining a default judgment. [Citation.]' " (*Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 281, italics omitted.) "Where, as here, the complaint properly states a cause of action, further proof of liability is not required." (*Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 901.)

However, one party's default "does not bind nondefaulting codefendants, even when the basis for the action against the codefendant is vicarious liability arising from the acts of the defaulting codefendant." (*Western Heritage Ins. Co. v. Superior Court* (2011) 199 Cal.App.4th 1196, 1211.) " 'It "is an established principle of law that admissions implied from the default of one defendant ordinarily are not binding upon a codefendant who, by answering, expressly denies and places in issue the truth of the allegations thus admitted by the absent party." ' " (*Ibid.*)

Browning and Dhillon rely on this latter authority. Busalacchi, however, maintains it does not assist them because they either invited or waived any claim of error in connection with the issue of Rodrigues's negligence.

"Appellants may be held to have waived a claim of error either by affirmative conduct or by failure to take proper steps in the trial court to avoid or cure the error." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2015) § 8:249, p. 8-177.) Even absent an express waiver, an appellant may waive a claim by acquiescence in the asserted error. (*Sperber v. Robinson* (1994) 26 Cal.App.4th 736, 742-743 ["At trial, counsel for appellant agreed that the issue of whether or not there was an equitable lien established was one for the trial court alone and that the jury's role would be only to determine the amount of any such lien. Such agreement constitutes a

4

waiver of the issue, since appellant and counsel acquiesced in and contributed to any such error," fn. omitted].)

"A party who fails to object to a special verdict form ordinarily waives any objection to the form." (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 530 (*Behr*); see *Orient Handel v. United States Fid. & Guar. Co.* (1987) 192 Cal.App.3d 684, 700 ["[A]ppellants actually are attacking the form of the special verdict questions. Their failure to object to those verdict forms below waives the issue on appeal"].) "When the issue is whether a question was omitted from a special verdict form, the issue must be raised before the jury is discharged." (*American Modern Home Ins. Co. v. Fahmian* (2011) 194 Cal.App.4th 162, 170, fn. 1; see *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131 ["[defendant] waived any objection to the special verdict form by failing to object before the court discharged the jury"].)

Under these principles, Browning and Dhillon are in no position to complain that the issue of Rodrigues's negligence was not submitted to the jury. After the trial court denied Rodrigues's motion to set aside his default, defense counsel agreed that Rodrigues's negligence was not "going to be a factor." Defense counsel likewise made no objection when Busalacchi's counsel told the court: "Here we have admitted negligence by Mr. Rodrigues. So that issue is out of play, as [defense] counsel has already said earlier, when we were going over the elements of negligent entrustment. First element is out of play already. So it's not even going to weigh on that issue because we've already had that decided here. [¶] So, you know, a limiting instruction, sure, can come in but [the] jury is not even going to decide Mr. Rodrigues[']s negligence."

Defense counsel also made no objection during the discussion of the special verdict, and in fact acquiesced to its form. "THE COURT: We're going over the special verdict form. I understand there's a change to the form that was submitted. . . . [¶] [Plaintiff's Counsel]: . . . [¶] What we would like to do is replace questions 1 through 6, which refer just specifically or generally to negligence. We'd like to replace those with questions more appropriate for negligent entrustment. [¶] THE COURT: [Defense counsel], are you in agreement that these changes need to be made, or should there be

5

another section on negligent entrustment?  I don't know how to go about this.  There are two theories.  [¶] [Defense Counsel]:  . . .  I am in agreement that to reduce confusion with the jury and be consistent with the theories presented in evidence, yes, negligent entrustment needs to be plugged in there.  I haven't looked at the special verdict for 724 yet.  So that may just be a matter of doing that and then plugging in the correct language.  [Plaintiff's Counsel]:  If I can help, in the back of the 700 section is a VF form, and 704 is the correct number, special verdict forms."  After the jury was excused, the court stated:  "We've gone over all the instructions.  The verdict form is kind of the last item we need to redo, and I think you've already redone it.  [¶] [Plaintiff's counsel]:  We are well on our way."  The special verdict form was then pre-marked with an affirmative answer to the question "Was Fermino Rodrigues negligent in operating the vehicle?" with the explanation "The court has made a determination on this issue outside the presence of the jury."

Defendants also never disputed that Rodrigues was negligent.  In closing argument, for example, Busalacchi's counsel told the jury:  "First question you are going to answer here is:  [¶] 'Was Fermino Rodrigues negligent in operating the vehicle.' That's been admitted.  That's an easy one."  Defense counsel not only made no objection, but acknowledged Rodrigues was negligent.

Nevertheless, relying on *Behr, supra,* 193 Cal.App.4th 517 and *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, Browning and Dhillon maintained at oral argument that defendants' conduct in the trial court must be overlooked because the special verdict form is "missing [an] element" of a negligence claim even as to Rodrigues, namely causation, and therefore is fatally defective and cannot support a negligence judgment. Both cases are readily distinguishable.

In *Saxena v. Goffney, supra,* 159 Cal.App.4th 316, the plaintiffs sued a physician for wrongful death, negligence, and battery, and the "court presented plaintiffs' version of the special verdict form to the jury."  The form asked only whether the patient gave informed consent, and did not ask whether the patient gave any consent at all.  (*Id.* at pp. 322-323.)  This precluded judgment on the battery claim, said the appellate court,

6

because "a claim based on lack of informed consent . . . sounds in negligence," while a claim that "a doctor perform[ed] a procedure without obtaining *any* consent" is the intentional tort of battery. (*Id*. at p. 324, italics added.) Since the form had not asked the jury to determine whether the physician had performed a procedure "with 'no consent' at all," it "did not include any findings on plaintiffs' battery cause of action" and thus was " 'fatally defective.' " (*Id.* at pp. 322, 324-325.) The court rejected the plaintiffs' argument that the physician had waived his right to challenge the special verdict form, noting that the physician was "not challenging the special verdict form as such," but was claiming the verdict returned by the jury did not support a judgment of battery. (*Id*. at p. 327.) Furthermore, the physician had objected to the "plaintiffs' special jury instruction on the grounds that it 'confuse[d the issue of] informed consent with battery.' " (*Id*. at p. 328.)

In *Behr*, the plaintiff sued her former boyfriend for negligence, fraudulent concealment, and fraudulent misrepresentation regarding his herpes infection. The jury found that the defendant was negligent and fraudulently concealed his herpes infection, as well as fraudulently misrepresented when he was contagious. (*Behr*, *supra*, 193 Cal.App.4th at p. 524.) On appeal, the defendant claimed the special verdict form as to fraudulent concealment was ambiguous because it "fail[ed] to specify whether the infection occurred before or after his . . . disclosure [of his infection to the girlfriend]." (*Id*. at p. 529.) The court held that the defendant "waived this alleged defect in the special verdict form." (*Ibid.*) However, as to fraudulent misrepresentation, the form failed to include a requisite element—a misrepresentation—and "the absence of such a finding preclude[d] judgment for the plaintiff on that claim." (*Id*. at p. 531.) The defendant did not waive this error because the lack of a misrepresentation finding was "not an ambiguity that needed clarification; it [was] simply the absence of a factual finding." (*Ibid*.)

In contrast to the situation in *Saxena* and *Behr*, where causes of action were purportedly submitted to the jury but the special verdict forms failed to include all requisite elements of the claims, here the record reflects that the parties and the court

7

viewed Rodrigues's negligence *in its entirety*—that is, duty, breach, causation, and damage—as having been withdrawn from the jury, leaving the special verdict form focused on the disputed negligent entrustment and respondeat superior claims against Acme, Browning and, Dhillon, and the amount of damages.  The conference at which the special verdict form was discussed makes this clear, i.e., the first six questions were retooled from pertaining "generally to negligence" to focusing on "negligent entrustment."  The final version of the verdict form thus focuses on negligent entrustment (questions 1 through 11) and respondeat superior liability (questions 12 through 17).[2]

It is therefore no surprise that in closing argument Busalacchi's counsel asserted Rodrigues's negligence had "been admitted."  Not only was there no defense objection, but defense counsel acknowledged Rodrigues was negligent and argued what the jury had to decide was whether Rodrigues's general incompetence or unfitness to drive, not his negligence on that particular day, was the cause of Busalacchi's injuries: "Question 11 says [¶] 'Was Mr. Rodrigues, his incompetence or unfitness, a substantial factor in causing the harm to Ms. Busalacchi?'  [¶] That's an important question.  It doesn't say was Mr. Rodrigues's negligence or—negligence a substantial factor.  It's his incompetence or unfitness. . . .  [¶] He may have been, as I said, impatient in trying to get his passengers off to the cruise terminal, but he wasn't reckless.  He wasn't incompetent.

---

[2]  Defense counsel also maintained at oral argument that it was Busalacchi's, not defendants', obligation to seek to "correct" the special verdict form.  Even assuming there was anything to correct in the form (which there was not, given the parties' understanding as to the remaining disputed issues), Busalacchi was not solely responsible for the form.  Rather, " ' "[i]f the verdict is ambiguous *the party adversely affected* should request a more formal and certain verdict." ' " (*Behr*, *supra*, 193 Cal.App.4th at pp. 529-530 [although "the plaintiff[] was responsible for having a verdict form submitted to the jury on her case, . . . it was [defendant] who believed that the timing of the infection was important to determining liability or the absence thereof.  It was thus incumbent on him to see that findings regarding the timing of the infection were included in the verdict"].)  It is also clear from the record in this case that the trial court went over the special verdict form with *all* parties.  Accordingly, if any party had an issue with the form, it was incumbent on that party to make an objection.

8

He wasn't unfit. *He bumped into the car in front of him because he wasn't paying attention.*"  (Italics added.)

In short, what the record makes clear is that defendants made the sensible decision to essentially stipulate Rodrigues was negligent and to focus their efforts on defending against the negligent entrustment and respondeat superior claims in front of the jury and, subsequently, the alter-ego claims before the trial court.  Indeed, defendants were largely successful in front of the jury, obtaining defense verdicts on the negligent entrustment claims and on the respondeat superior claims, except as to Acme.  Now, in the wake of the trial court's adverse decision on the alter-ego claims, Browning and Dhillon are essentially trying to retract their trial strategy—an effort that comes far too late in the day under any principal of appellate review.[3]

*Comparative Negligence*

Browning and Dhillon also complain that the trial court erred in refusing a defense request for an instruction on comparative fault.  As did the trial court, we conclude that the record did not warrant such an instruction.

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp*. (1994) 8 Cal.4th 548, 572.)  "[A]ppellant has the burden of showing that substantial evidence supports it theory. . . ."  (*Blevin v. Coastal Surgical Institute* (2015) 232 Cal.App.4th 1321, 1330.)

Defendants maintain Rodrigues's videotaped deposition testimony constituted substantial evidence that Busalacchi was negligent.

---

[3] We note that the jury was instructed on causation, the element of a negligence claim Browning and Dhillon claim was missing from the special verdict form.  It appears this instruction was given in connection with the negligent entrustment claims, as one of the elements is causation.  This is also consistent with what otherwise appears from the record—that both parties viewed Rodrigues's agreed-to negligence liability as embracing duty, breach, causation, and damage (the only question being the amount of damages), and viewed the disputed issues as negligent entrustment, respondeat superior liability and alter-ego liability.

However, all Rodrigues's deposition testimony showed was that there was stop-and-go-traffic, Busalacchi stopped, and Rodrigues rear-ended her, causing her to hit the car in front of her. "[W]e were driving slowly. Was making stops. Little bit moving, again stop. So it was crazy traffic. . . . [¶] So two times this lady who was in front of me made a stop. And second time I remember exactly I honked the horn; that she wasn't moving, you know. . . . [¶] . . . And again, when the traffic was, you know, stopped and was trying to move slowly, you know. And I was close by. Like, maybe I will say two feet, you know. And all of a sudden she made a brake and moved. And all of a sudden when I was moving slow, I notice, like, she made a stop and I just pedal my brake. Right barely touch. . . . And by the time I touch her, she made an accelerate, like voom. Like young children how they drive like a sports car. So she accelerated so fast and like I will say not even five feet she hit the car. And she hit the car and—which was moving, and both of them went one block away and they made a stop."

Rodrigues went on to concede, however, that "Mrs. Busalacchi was pushed into another car as a result of the collision." That is also what was stated in the police report: "Vehicle #1 [Rodrigues's taxicab] northbound on the Embarcadero . . . [¶] with F/E. Front end. . . . [¶] [c]ontacted R/E—rear end—of Vehicle #2 [Busalacchi's vehicle] northbound on the Embarcadero." . . . "Force of impact moved Vehicle #2 northbound and with front end contacted rear end of Vehicle #3 [third party vehicle] northbound." And on further questioning by Busalacchi's counsel, Rodrigues did not dispute what was in the report: "So the force of the impact moved Ms. Busalacchi's vehicle into the other vehicle. [¶] [Rodrigues]: Okay. [¶] [Counsel]: Is that right? [Rodrigues]: So the force— the force of her vehicle or my vehicle? [¶] [Counsel]: The force of the impact. So when you hit Ms. Busalacchi . . . [¶] . . . [¶] it pushed her into the other car. [¶] [Rodrigues]; Okay. [¶] [Counsel]: Is that right? [¶] [Rodrigues]: Well, it is mentioned here, but for me it doesn't sound good. [¶] [Counsel]: No, it doesn't sound good to me either."

Thus, although Rodrigues may, at one point, have characterized Busalacchi as "accelerating" after the impact, there was no evidence that *Busalacchi* was responsible for that forward movement. On the contrary, all the evidence was that Rodrigues was

10

responsible.  As the trial court explained in denying the request for a comparative fault instruction:  "What is going to be the evidence that it's her fault anyways?  What's the fault if you get hit from behind—you're in traffic, you get hit from behind, and your car lurches or moves [forward], that's your fault?  That you were expecting that someone was going to hit you from behind, and you were supposed to keep your foot on the brake?  [¶] What expert is going to fill in that blank?  If there's no expert on your side that's going to fill in the blank, this clearly is not coming in.  And that expert would have had to have been disclosed, which leads me to believe there's no expert that's going to do that, and there being no expert, there's no basis to give this comparative fault instruction."[4]

The defense request for a comparative fault instruction was therefore properly denied.

*Evidence of Acme's Lack of Liability Insurance*

Browning and Dhillon claim the trial court abused its discretion in allowing evidence of the lack of liability insurance on Rodrigues's cab.  The court allowed this evidence for the limited purpose of establishing negligent entrustment—claims on which all defendants prevailed.  Thus, Browning and Dhillon are in no position to complain about the evidentiary ruling since any error clearly was not prejudicial.  (See *People v. Webb* (1986) 186 Cal.App.3d 401, 411 ["[A] fundamental rule of appellate procedure . . . precludes an appellant from raising issues favorable to himself"]; *Tint v. Sanborn* (1989) 211 Cal.App.3d 1225, 1235 ["Error, if any, was harmless, because the jury ruled in [appellant's] favor"]; *In re Marriage of Moore* (1980) 28 Cal.3d 366, 374 [Because appellant was not prejudiced by the error, reversal of this portion of the judgment is unwarranted].)  Indeed, Browning and Dhillon seem to have lost sight of the fact that

---

[4] At oral argument, defense counsel pointed to Rodrigues's deposition testimony that Busalacchi stopped and started, and characterized this as erratic driving sufficient to support a comparative fault finding.  Not so.  Rodrigues simply described stop-and-go traffic.  The only negligence his testimony reveals is his admission he was following "too closely" behind her and lack of attention given the "crazy" traffic.

they are the only parties who have appealed, and the sole basis of their liability is the alter-ego claims that were tried by the trial court, *not* by the jury.

In any case, the trial court did not mishandle the no-liability insurance evidence in front of the jury. The court allowed the evidence on the theory that if Acme had applied for insurance, as it was required to do under San Mateo City Charter and Municipal Code, part 5.75.050, the insurer would likely have required information regarding Rodrigues's driving record, which would have put Acme on notice of his poor record. The court also overruled a section 352 objection, finding the probative value of the evidence outweighed any prejudice. We review a trial court's evidentiary ruling for abuse of discretion. (*People v. Doolin* (2009) 45 Cal.4th 390, 437.)

As defendants point out, "[e]vidence of a defendant's insurance coverage is ordinarily not admissible to prove the defendant's negligence or other wrongdoing." (*Blake v. E. Thompson Petroleum Repair Co. Inc.* (1985) 170 Cal.App.3d 823, 830.) However, "where the topic of insurance coverage is coupled with other relevant evidence, that topic may be admitted along with such other evidence. It has always been the rule that the existence of insurance may properly be referred to in a case if the evidence is otherwise admissible. '[Citation.] The trial court must then determine, pursuant to Evidence Code section 352, whether the probative value of the other evidence outweighs the prejudicial effect of the mention of insurance." (*Id.* at p. 831.)

Here, the trial court instructed the jury on liability insurance as follows: "As a general rule, you must not consider whether any of the parties in this case has insurance. Presence or absence of insurance is irrelevant. [¶] However, an exception to this rule is that evidence of insurance may be considered for a limited purpose, if coupled with other evidence, to prove or disprove a particular issue. [¶] In this case, concerning the issue of negligent entrustment, you may consider the presence or absence of insurance only with regard to the particular vehicle operated and involved in the subject accident. You must not otherwise consider whether any of the [parties] in this case has insurance."

Although somewhat attenuated, lack of insurance did have some relevance to the issue of negligent entrustment. The trial court also duly exercised its discretion under

12

section 352. In any case, the jury was instructed it could consider the evidence only for the limited purpose of the negligent entrustment claim, on which defendants prevailed. "Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed.' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804.) No such evidence is in the record here. Accordingly, even assuming Browning and Dhillon are aggrieved by the trial court's evidentiary ruling for purposes of appeal—which they are not—the trial court properly handled the lack of insurance evidence in front of the jury.[5]

*Evidence of Acme's Prior Illegal Acts*

Browning and Dhillon similarly complain about evidence of Acme's prior bad acts, including permit violations, impounds, violations of municipal codes, and prior lawsuits. This is another evidentiary issue pertaining to the negligent entrustment claims on which they prevailed. Accordingly, any asserted error was clearly non-prejudicial and they are not aggrieved for purposes of appeal.

In any case, the trial court also properly handled this evidence in front of the jury. Evidence Code section 1101 provides in part: "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subds. (a), (b).)

---

[5] For the same reasons, Browning and Dhillon are in no position to complain about the trial court's reference to the San Mateo City Charter and Municipal Code requiring insurance as a "standard of care." They prevailed on the negligent entrustment claims, and the court properly handled the evidence in front of the jury in any event.

Browning and Dhillon contend the admission of "so much irrelevant and highly prejudicial evidence created the risk that the jury . . . would impose liability, based not on evidence about the accident at issue, but on an inference that 'negligence' was a trait of . . . . Appellants' character," relying on *Diaz v. Carcamo* (2011) 51 Cal.4th 1148 (*Diaz*). Again, Browning and Dhillon ignore the fact the jury did not find them liable under either theory—negligent entrustment and respondeat superior—entrusted to it. Accordingly, their argument of supposed jury confusion goes nowhere.

In any case, *Diaz* is distinguishable, and the trial court did not abuse its discretion in allowing this evidence before the jury. In *Diaz*, the Supreme Court held that admission of an employee's past driving record constituted prejudicial error, because, as defendants quote from the opinion, "Such evidence creates a prejudicial risk that the jury will find that the employee drove negligently based not on evidence about the accident at issue, but instead on an inference, drawn from the employee's past accidents, that negligence is a trait of his character." (*Diaz, supra*, 51 Cal.4th at p. 1162.)

*Diaz* also involved a motor vehicle accident, and the plaintiff claimed the defendant employer was "both vicariously liable for [the] employee['s] . . . negligent driving and directly liable for its own negligence in hiring and retaining him." (*Diaz, supra*, 51 Cal.4th at p. 1152.) However, defendant employer "offered to admit vicarious liability if its employee . . . was found negligent." (*Id.* at p. 1153.) That admission, defendant employer argued, should have barred plaintiff from further pursuing her negligent entrustment, hiring, and retention claims. (*Ibid.*) The trial court nevertheless admitted evidence of the employee's driving and employment history in connection with those claims and sent them to the jury, which found for the plaintiff. (*Ibid.*)

The Supreme Court reversed, holding "an employer's admission of vicarious liability for an employee's negligent driving in the course of employment bars a plaintiff from pursuing a claim for negligent entrustment." (*Diaz, supra*, 51 Cal.4th at p. 1161.) Accordingly, all of the evidence of the employee's past accidents and poor employment record "should have been excluded" once defendant employer "offered to admit vicarious liability." (*Ibid.*)

14

Here, in contrast, the defendants did not offer to admit vicarious liability for Rodrigues's negligence. Thus, negligent entrustment and respondeat superior liability remained at issue, relevant evidence was admissible, and these claims were properly sent to the jury. The evidence of Rodrigues's prior misconduct was therefore properly admitted. Likewise, the evidence of Acme's, Browning's and Dhillon's past misconduct—which defendants describe as "permit violations and impounds from the years 2007-2008, a 2007 lawsuit, and an unrelated fatal accident"—was relevant and properly admitted.[6] There is no merit to Browning's and Dhillon's assertion that this evidence was irrelevant because it concerned the 2007-2008 time frame. This was the period during which Rodrigues was hired as a driver. Thus, the evidence was relevant to show defendants' negligent practices during this time and their disregard of the laws and regulations applicable to taxicabs and drivers, including permit requirements for background checks. The jury, in turn, was instructed it could consider this evidence only for the limited purpose of considering Busalacchi's negligent entrustment claim.

Accordingly, even if Browning and Dhillon were aggrieved by this evidence for purposes of appeal—which they are not—the trial court did not abuse its discretion in allowing this evidence for a limited purpose.

*Alter Ego Determination*

Browning and Dhillon lastly take issue with the trial court's finding that they are alter egos of Acme. As to this issue, Browning and Dhillon are aggrieved for purposes of appeal as this is the sole basis on which they are liable for the judgment.

"Whether the evidence has established that the corporate veil should be ignored is primarily a question of fact which should not be disturbed when supported by substantial

---

[6] In fact, Browning and Dhillon have provided no citation to the record indicating where the evidence of Acme's and their past misconduct was admitted or precisely what it consisted of. "It is not the task of the reviewing court to search the record for evidence that supports the party's statement; it is for the party to cite the court to those references. Upon the party's failure to do so, the appellate court need not consider or may disregard the matter." (*Regents of the University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826, fn. 1.)

15

evidence." (*Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1108.)

" ' "Ordinarily, a corporation is regarded as a legal entity separate and distinct from its stockholders, officers and directors. Under the alter ego doctrine, however, where a corporation is used by an individual or individuals, or by another corporation, to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation. [Citations.] . . . [Citation.]' [Citation.] When a court does so, it is said to have 'pierced the corporate veil.' " ' " (*Toho-Towa Co. Ltd. v. Morgan Creek Productions, Inc.*, *supra*, 217 Cal.App.4th at p. 1106-1107.) With one exception, "[a] member of a limited liability company shall be subject to liability under the common law governing alter ego liability. . . ."[7] (Corp. Code, § 17703.04, subd. (b).)

"It is a fundamental rule applicable to cases invoking the alter ego doctrine that the conditions under which the corporate entity may be disregarded necessarily vary according to the circumstances of each case inasmuch as the doctrine is essentially an equitable one, and for that reason is particularly within the province of the trial court. [Citations.] The two basic requirements for the application of this doctrine are: (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and (2) that, if the acts are treated as those

---

[7] Section 17703.04, subdivision (b) provides that "the failure to hold meetings of members or managers or the failure to observe formalities pertaining to the calling or conducting of meetings shall not be considered a factor tending to establish that a member or the members have alter ego or personal liability . . . where the articles . . . do not expressly require the holding of meetings . . . ." Browning and Dhillon therefore claim the trial court erred in noting the lack of corporate minutes. The court's only statement in this regard was: "There was no evidence of minutes that were taken that this business operated like an LLC or any formal entity other than the bank accounts, and the Court's taken that into consideration." To the limited extent the court considered lack of minutes, it did so only to note that minutes might have provided evidence that Acme operated like a "formal entity." In any case, as we will discuss, there is ample evidence, apart from the lack of minutes, supporting the trial court's finding of alter ego liability.

of the corporation alone, an inequitable result will follow." (*Auer v. Frank* (1964) 227 Cal.App.2d 396, 407-408, italics omitted.)

"The first requirement for disregarding the corporate entity under the alter ego doctrine—whether there is sufficient unity of interest and ownership that the separate personalities of the individual and the corporation no longer exist—encompasses a series of factors. Among the many factors to be considered in applying the doctrine are one individual's ownership of all stock in a corporation; use of the same office or business location; commingling of funds and other assets of the individual and the corporation; an individual holding out that he is personally liable for debts of the corporation; identical directors and officers; failure to maintain minutes or adequate corporate records; disregard of corporate formalities; absence of corporate assets and inadequate capitalization; and the use of a corporation as a mere shell, instrumentality or conduit for the business of an individual. [Citation.] This list of factors is not exhaustive, and these enumerated factors may be considered with others under the particular circumstances of each case. ' "No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." ' [Citation.]" (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1073.) The court in *Associated Vendors* set forth numerous other appropriate factors to consider, including unauthorized diversion of corporate funds or assets to other than corporate uses; the treatment by an individual of the assets of the corporation as his own; the concealment and misrepresentation of the identity of the responsible ownership, management, and financial interest; the disregard of legal formalities and the failure to maintain arm's length relationships. (*Associated Vendors, Inc. v. Oakland Meat Co., supra,* 210 Cal.App.2d at pp. 838-840.)

At the bifurcated bench trial on alter ego liability, Browning testified regarding Acme's finances. Employees were paid in cash. All of their salaries were "off the books," meaning Acme did not pay withholding taxes, and had not done so since 2008. Acme did not withhold or pay for unemployment insurance, state disability insurance, employment training tax, or workers' compensation insurance. Acme did not provide W-2 forms, W-4 forms, or 1099 forms for its employees. Browning was paid in the form of

17

"draws," which he did not receive on a regular basis, just from "time to time . . . [¶] . . . [¶] [w]hen we feel there's enough cash." During the preceding five years, Browning and Kaur had received a total of about a million dollars from the company.

Browning also testified that Acme did not have enough assets to cover Busalacchi's judgment. In fact, there were about seven outstanding judgments against the company, not including Busalacchi's, totaling $40,000 to $50,000. But Acme had only about $20,000 in the bank. When asked if he had "any intention of paying those [judgments]," Browning testified "we're waiting for them to try to collect. We are not running to them."

Browning, Dhillon, and Kaur all have signature authority over the bank account, and only one signature is required. Acme keeps cash in its safe, with a "tally sheet" of how much cash comes in and is paid out. Acme did not report any of its cash receipts as income on its income tax returns. Browning acknowledged the amount of income reported on the tax returns did not correlate with the cash distributions made to him and Kaur. He explained this was because he was "not an accountant." He agreed he "avoid[ed] and skirt[ed] taxes on cash that's brought into [the] company."

Additional evidence showed Acme insured only five of its 25 cabs. Its lease agreement with its drivers indicated the company would provide liability insurance. Browning testified that the agreement had been "copied from some other company. . . . [W]e just haven't updated that." He also had told the drivers that, despite the language of the lease, Acme provided no insurance. Acme had, however, made a $35,000 cash deposit with the Department of Motor Vehicles, pursuant to Vehicle Code section 16500, in lieu of insuring all of its taxicabs.[8]

Dhillon testified he was "not an employee, but I help out." Acme Yellow LLC was started by Dhillon's wife, Amandeep Kaur, and Browning, when they purchased the

---

**8** "Proof of financial responsibility may be maintained by . . . : [¶] . . . [¶] . . . depositing with the department thirty-five thousand dollars ($35,000), which amount shall be deposited in a special deposit account with the Controller for the purpose of this section. (Veh. Code, § 16500, subd. (c).)

18

assets of another taxicab company called ABC Networks, LLC. Dhillon's brother owned ABC, and Dhillon was a driver for the company. Dhillon claimed he was "just present" for the purchase negotiations, and it 'was mostly Mr. Browning and my wife [Kaur] that negotiated the price with my brother." Dhillon also worked for ABC's predecessor company, Yellow Cab Company Bay Area.

Indicating it considered the factors set forth in *Associated Vendors, supra*, 210 Cal.App.2d 825, the trial court "highlighted" those it found particularly persuasive, including undercapitalization of the business, absence of corporate formalities, and diversion of funds. The court found "concealment or misrepresentation of responsible ownership management and financial interest" and "diversion of assets from the corporation," specifically "not credit[ting]" defendants' testimony to the contrary. The court further noted that defendants admitted "a significant amount of cash [was] not reported" on income tax returns.

Browning and Dhillon maintain the trial court erred in finding that the LLC lacked adequate capitalization, asserting the LLC agreement evidences Browning and Kaur "had each contributed $150,000 in capital at the formation of the LLC." To the contrary, the LLC agreement states: "Each member shall contribute to the Company the Member's Capital Contribution as follows: [¶] For Jeffrey P Browning, the sum of $150,000, consisting of *non-cash assets* of same value. [¶] For Amandeep Kaur, the sum of $150,000, consisting of *non-cash assets* of same value." (Italics added.) There is no evidence of what those "non-cash assets" were.

In fact, there is no evidence of capitalization beyond the approximately $20,000 in the bank account, and the undocumented amount of "about . . . 3 to $4000" in cash in the company safe. Defendants maintain there were "substantial non-cash assets" in the form of the fleet of taxis, "which Respondent's counsel argued were capable of generating income of $520,000 per year." But again, there is no *evidence* of the value of the taxis or their income-generating potential. Counsel's argument is not evidence.

Defendants further assert that the $20,000 bank balance plus the $35,000 deposited with the Department of Motor Vehicles together provided sufficient capital to

19

meet the obligations of the LLC, noting that the other outstanding judgments totaled only between $40,000 and $50,000.[9] The $35,000 deposited with the Department of Motor Vehicles, however, is not capital available to pay any ongoing obligations of the business.[10] That amount must remain deposited with the Department of Motor Vehicles until "the person entitled thereto . . . is no longer required to maintain proof of financial responsibility as required by this section or upon his or her death." (Veh. Code, § 16500, subd. (d).) Browning acknowledged "we are not able to withdraw it from [the bank account]. There's some legal mechanism by which the DMV, I believe, has control over it." Moreover, the outstanding judgments were not Acme's only ongoing obligations. Browning testified Acme's expenses included paying the dispatchers and insurance on five of the taxis in the fleet.

Dhillon additionally argues alter ego liability was erroneously imposed on him because he "is not a member of the LLC." He maintains "[o]wnership of stock . . . is . . . a threshold question under California's alter ego analysis," citing *Firstmark Capital Corp. v. Hemple Financial Corp*. (9th Circ. 1988) 859 F.2d 92, 94. *Firstmark*, however, held that a wife, who owned no stock in a corporation, nevertheless had a community property interest in her husband's shares which was "sufficient to satisfy the ownership requirement" of the alter ego doctrine. (*Ibid.*) Dhillon asserts Busalacchi "failed to prove that [he] had any community property interest in the LLC," because there was no

---

**9** Although Browning and Dhillon claim the company also had "$25,668 in its bank account," Browning testified the company had only "roughly 20,000" in the bank.

**10** Browning and Dhillon further claim, for the first time in their reply brief, that the "State Financial Responsibility Statute was the proper standard of care for analysis of the adequacy of Acme Yellow's capitalization." It is well established that new issues cannot be raised for the first time in a reply brief on appeal. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 766 ["We refuse to consider the issues raised by defendant in his reply brief which were not raised in his opening brief"].) Furthermore, although statutory standards are "commonly invoked by plaintiffs in negligence actions to establish a breach of duty," the issue of alter ego liability is entirely different, and defendants have cited no authority for the proposition that the financial responsibility statute for taxicabs is related to the capitalization requirements for LLCs.

"evidence that the couple had an agreement to hold [Kaur]'s interest in the LLC as community property."

"Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property."  (Fam. Code, § 760.)  Moreover, under this section, " 'there is a general presumption that property acquired during marriage by either spouse other than by gift or inheritance is community property unless traceable to a separate property source.'  [Citations.]"  (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 731.)

The evidence showed Kaur acquired her interest in the LLC during her marriage to Dhillon.  Dhillon, however, asserts that because "record title to the LLC [is] in [Kaur's] own name" and Dhillon executed a "spousal consent" to the LLC operating agreement, that "the presumption is that [Kaur's] ownership interest in the LLC is her separate property."

The "spousal consent" on which Dhillon relies states in part:  "I, Param Dhillon, spouse of Amandeep Kaur, notwithstanding any laws, if any, of the State of California or any other State, hereby consent to the terms and conditions set forth in the Operating Agreement of Acme Yellow LLC, and agree to be bound by all its terms, including but not limited to any restrictions and/or requirements to the transfer of my spouse's interests in Acme Yellow, LLC, whether during our lives or as a result of any testamentary or intestate bequests."  The terms of the operating agreement with regard to transfer of interest in Acme Yellow, LLC provide: "Except as expressly provided in this Agreement, a Member shall not transfer any part of the Member's Membership interest in the Company . . . unless (1) the Company and/or other Members have exercised, or declined to exercise, their right to purchase the withdrawing Member's Membership Interest . . . and (2) the Membership Interest to be transferred, when added to the total of all other Membership Interests transferred in the preceding 12 months, will not cause the termination of the Company under the Code. . . .  Notwithstanding any other provision of this Agreement to the contrary, a Member may transfer all or any portion of his or her Membership Interest to a revocable trust created for the benefit of the Member, or any

21

combination between or among the Member, the Member's spouse, and the Member's issue; provided that the Member retains a beneficial interest in the trust and all of the Voting Interest included in such Membership Interest."

Dhillon asserts the LLC operating agreement and the spousal consent operated to transmute the nature of Kaur's interest in the LLC to her separate property, relying on Family Code section 852, subdivision (a). That section provides: "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected."

Our Supreme Court has interpreted "an 'express declaration' as language expressly stating that a change in the characterization or ownership of the property is being made. [Citation.] '[A] writing signed by the adversely affected spouse is not an "express declaration" for the purposes of [Civil Code] section 5110.730[, subdivision] (a) [now Fam. Code, § 852, subd. (a)] unless it contains language which expressly states that the characterization or ownership of the property is being changed.' [Citation.]" (*In re Marriage of Starkman* (2005) 129 Cal.App.4th 659, 664.)

Neither the LLC operating agreement nor the spousal consent expressly states anything about the characterization or ownership of the interest in the LLC being changed. Thus, they do not operate to change the character of Kaur's interest.

In sum, substantial evidence supports the trial court's finding of alter ego liability and conclusion that this case "cries out for the alter ego . . . doctrine."

DISPOSITION

The judgment is affirmed. Respondent to recover costs on appeal.

22

_____
Banke, J.

We concur:


_____
Humes, P. J.


_____
Dondero, J.