Filed 4/22/16  Cabrera v. Gransee CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| TONY CABRERA, | H040014 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. M108874) |
| v. | |
| ROBERT LYLE GRANSEE et al., | |
| Defendants and Appellants. | |

Defendant Robert Lyle Gransee was driving his vehicle for his employer, defendant Taylor Fresh Foods, Inc., when his vehicle hit the rear of plaintiff Tony Cabrera's truck.  Defendants conceded that they were responsible for the collision, but disputed the cause of Cabrera's injuries and the amount of his damages.  Following trial, the jury awarded Cabrera $2,120,292.62 in damages.  On appeal, defendants contend:  (1) the trial court abused its discretion in excluding expert testimony by a biomechanical engineer; and (2) there was insufficient evidence to support the award of $200,000 in future medical costs.  We affirm the judgment.

## I. Statement of Facts

### A. Plaintiff's Case

On October 24, 2008, Cabrera, a 27-year-old journeyman carpenter, was driving a 2005 GMC Canyon pickup truck to his home in Fresno from his employment at a construction site. Gransee was driving a 2005 Ford Escape to visit customers of Taylor Fresh Foods, Inc. When Cabrera's truck came to a stop to allow another vehicle to make a turn, Gransee failed to use his brakes and his vehicle hit the rear of Cabrera's truck.

Gransee estimated that his speed was 25 to 30 miles per hour when the accident occurred. Cabrera's truck lurched forward five to 10 feet. Cabrera's back hit the back of his seat, his cell phone was thrown under the passenger's seat, the visors "flew open," and his hat fell off his head. Cabrera experienced "major back pain, . . . like [his] spine kind of ripped out of [his] head, the back of my head, just straight out." Cabrera pulled to the side of the road and "felt like [he] couldn't move for a good five minutes." He was in "major pain" and "very confused." Neither Gransee nor Cabrera called the police or paramedics to the scene. Cabrera observed that the front of Gransee's vehicle was "pretty much smashed in." The right side of the bumper on Cabrera's truck was smashed in and the left side of the bumper extended four inches away from the truck.

After exchanging information with Gransee, Cabrera decided to go home even though he was in pain. Cabrera estimated that his trip home, which was usually two and a half hours, was about five hours. After Cabrera stopped for gas, he stopped several more times, because he felt dizzy, his head was pounding, and "his back was like kicking [him] hard." Though Cabrera normally drove in a reclining position, he pulled the seat forward to have more support on his back.

Cabrera went to the emergency room that night at around 11:00 p.m. or 11:30 p.m. An X-ray showed no fractures and Cabrera was given pain medication. Cabrera returned to the emergency room about a week later, because he was still experiencing "major

2

pain." The diagnosis was "strain back chondral lumbosacral." The nurse practitioner indicated that he could return to work in a few days. However, Cabrera never returned to work as a journeyman carpenter after the motor vehicle accident.

About a month after the accident, Cabrera was experiencing "a lot of neck pain, back pain, muscle spasms." On November 19, 2008, Cabrera saw Karl Quinn, M.D. Dr. Quinn observed that Cabrera felt pain with flexing, bending, and rotating, pain and tenderness in the middle back, as well as neck pain. According to Dr. Quinn, the cause of Cabrera's injury was the motor vehicle accident. He explained that the "temporal relationship between the onset of his symptoms and the accident was very suspicious. It was what was causing his symptoms." Dr. Quinn extended Cabrera's status as disabled.

Dr. Quinn examined Cabrera about a month later. Cabrera continued to have limited range of motion and pain in the lower back, which was worse with bending or stooping, and Cabrera felt that he was unable to work. Dr. Quinn's diagnosis was low back pain and he referred Cabrera to physical therapy. When Cabrera began physical therapy, it was observed that he was having some spasms in his back.

In January 2009, Dr. Quinn examined Cabrera and noticed that his gait had changed and he was having more lower back pain on his right side than on his left. Dr. Quinn prescribed steroids. In March 2009, Dr. Quinn examined Cabrera and found that he had tenderness in his right lower back, pain along the upper edge of his pelvis, and a normal gait. Since Cabrera's pain persisted despite his participation in physical therapy, Dr. Quinn referred him to Jaipal Sidhu, M.D., a physical medicine and rehabilitation specialist. Dr. Sidhu diagnosed chronic lumbar pain with no signs of radiating pain and recommended an MRI scan. The MRI scan showed abnormalities between the fifth lumbar and first sacral vertebrae, that is, at the "L5-S1 level." It also showed "a trace of a broad-based disc bulge with no spinal or . . . neuroforaminal stenosis."

3

In June 2009, Dr. Quinn discussed the MRI findings with Cabrera. Dr. Quinn stated that surgery and epidural injections were possible treatment options. However, Dr. Quinn explained that, given Cabrera's age, he was concerned that surgery could lead to additional surgeries, which "don't relieve the[] pain reliably or for the long term." Dr. Quinn also noted that epidural injections were not reliable in relieving pain. Cabrera chose to have an epidural injection, which was given at the L5-S1 level, but his pain worsened. When Dr. Quinn examined Cabrera in July 2009, Cabrera had low back tenderness, was stiff, and was unable to sit for the whole interview. Dr. Quinn found Cabrera's presentation consistent with discogenic pain, which originates from a damaged disc. He also suggested that Cabrera consider retraining, because Dr. Quinn did not consider it likely that he would be returning to work as a carpenter.

In September 2009, Dr. Quinn examined Cabrera, who reported that he continued to have pain and was "really limited" in his ability to bend and move. Dr. Quinn extended Cabrera's time off work for another two months. He also encouraged him again to consider job retraining and to get an examination by an independent medical examiner.

In November 2009, Dr. Quinn examined Cabrera and found that he had decreased range of motion of his spine and some pain on his tailbone. Given the passage of time and Cabrera's failure to benefit from pain medication, injections, and physical therapy, Dr. Quinn declared his injury "permanent and stationery." He referred Cabrera to a neurosurgeon, Ali Najafi, M.D., who recommended lumbar fusion surgery.

Cabrera had also experienced back pain approximately two years prior to the motor vehicle accident. In October 2006, Cabrera was seen by a nurse practitioner. He stated that he had developed back pain six weeks earlier. In November 2006, Dr. Quinn examined Cabrera and found that he had tenderness on the right and lower back at the L4-5 level. Dr. Quinn advised him that if his back did not improve, he might consider another career. Dr. Quinn allowed him to return to modified work from November 17 to

4

December 3, 2006, and he cleared him to return to full duty as of December 4, 2006. Cabrera did not experience any back problems after December 4, 2006 until the motor vehicle accident.

In March 2011, Tejinder Randhawa, M.D. examined Cabrera, who continued to complain of lower back pain. Dr. Randhawa diagnosed Cabrera with lumbago, which could have been caused by nerve pinching, arthritis, a slipped disc, osteoarthritis, or muscle strain. Dr. Randhawa referred Cabrera to a neurologist.

In April 2011, Madhav Suri, M.D., performed a neurological examination of Cabrera. Dr. Suri reviewed records from Dr. Randhawa. During the examination of Cabrera, he found the straight leg rise significant because it implied that the nerve root at the L5-S1 level and possibly the L4 level was irritated. His initial impression was that the likely cause of Cabrera's pain was lumbar spondylosis or degeneration of the discs. According to Dr. Suri, lumbar spondylosis can be degenerative or the result of acute trauma. Dr. Suri reviewed the October 2011 MRI and noted that there was degeneration of the disc at the L5-S1 level and some disc bulge at L4-5, but Cabrera's other lumbar discs were healthy. Dr. Suri explained that most disc herniations occur with injury at the L5-S1 level, because the spine curves at this point. Dr. Suri opined that the motor vehicle accident in 2008 was the cause of the MRI findings based on the fact that Cabrera's back problems were "bilateral radiating pain into both buttocks and legs [which] occurred after the accident." Dr. Suri also stated that Cabrera's back complaints in 2006 did not change his opinion.

Timothy Watson, M.D., an orthopedic spine surgeon, testified as an expert in orthopedic surgery. Dr. Watson reviewed Cabrera's medical records and examined him in December 2011 and February 2013. He also reviewed the 2009 and 2011 MRI scans. These scans showed that Cabrera had degenerative disc disease at the L5-S1 level. In Dr. Watson's opinion, Cabrera had a preexisting degenerative disc disease which was

5

exacerbated by the motor vehicle accident. He explained that Cabrera's condition "predispose[d] him a little bit to lesser forces involved to create an injury," and that "he went through some sort of trauma in the motor vehicle accident, and it essentially kind of stirred up things down there."[1] Dr. Watson opined that Cabrera's condition was permanent and that he was a candidate for fusion surgery. He also opined that Cabrera would be a candidate for more than one surgery.

Dr. Watson reviewed the testimony of various defense witnesses. He disagreed with the statement that there were no studies that lumbar fusion surgery improved back pain. He also disagreed with the statement that "everybody is going to get better within a month" from a back injury.

Jim Anderson, M.D. testified that the cost of Cabrera's future medical treatment included the cost of physical therapy "every year or two if he had flare-ups that often," medication, including steroid injections costing $1,500 to $2,000, and office visits. He also testified that a TENS unit was expensive and depended on the patient's insurance plan. Regarding the cost of future surgery, he testified that it ranged from $75,000 to $200,000 in various areas of California.[2]

**B. Defense Case**

Robert Schick, M.D. testified as an expert witness in radiology and neuroradiology. According to Dr. Schick, neither the X-rays of lumbar spine nor the

---

[1] However, Dr. Watson conceded on cross-examination that the herniation at the L5-S1 level could be the result of either a preexisting degeneration or acute trauma.

[2] Since defendants challenge only the sufficiency of the evidence to support the award of future medical expenses, we do not set forth the evidence supporting the award of damages for past and future lost earnings, past medical expenses, and past and future noneconomic loss, including physical and mental pain and suffering.

6

MRI scans showed an injury that he could attribute to the accident in 2008. He also opined that Cabrera's chronic degenerative disc disease at the L5-S1 level of the spine was present before the accident. In Dr. Schick's opinion, the "x-rays from October 23rd, 2008, up until an x-ray of March 8th, 2013, have been entirely stable, with no progression of any arthritis in the spine" and "the lumbar spine MRI scans that were taken two years apart showed no progression; in fact, the lumbar spine actually showed some improvement."

Dr. Anderson testified as an expert witness in neurosurgery. He reviewed Cabrera's medical records and examined him in July 2012. Dr. Anderson stated that Cabrera's medical records from 2006 showed that Cabrera "had previous symptoms from a rather extensive degenerative process in his lumbar spine . . . ." According to Dr. Anderson, the examination of Cabrera that occurred the day after the accident showed "a soft tissue injury of his neck and probably his lower back, but there's no indication of anything more ominous or serious." In reviewing Cabrera's records, Dr. Anderson saw no evidence of an acute herniation of the lumbar disc. In Dr. Anderson's opinion, the MRI scan in 2009 showed a bone spur at Cabrera's L5-S1 level, which took years to develop and could not have occurred as a result of the accident. The MRI scan in 2011 also showed the degenerative changes in the bone spur formation at the L5-S1 level.

Dr. Anderson opined Cabrera had a soft tissue injury with his neck and lower back and did not sustain an injury to the L5-S1 disk as a result of the accident. He stated the basis for his opinion: the changes on the MRI scan were degenerative and not the result of a single event; and the description of the accident, that is, Cabrera was restrained by a seat belt, his back was against the seat, and the impact was from behind. According to Dr. Anderson, Cabrera could have returned to work a month after the accident. Dr. Anderson could not draw any connection between the accident and Cabrera's pain.

Louis Cheng, Ph.D., a consulting engineer, testified as an expert in the area of accident reconstruction. He considered the damage to the vehicles involved in the accident and quantified that information to determine the forces operating on the vehicles. Dr. Cheng calculated that Cabrera's "truck was most likely moved from a stopped position to 10 to 12 miles an hour as a result of the impact" while Gransee's vehicle "was most likely going 15 -- 16 to 20 miles plus miles an hour, and as a result of the impact, it got slowed down by nine to 11 miles an hour." Dr. Cheng outlined various factors that supported his accident reconstruction analysis, including Cabrera's testimony, comparisons with low speed impacts of similar vehicles, and airbag deployment.

## II. Discussion

### A. Admissibility of Expert Testimony

Defendants contend that the trial court abused its discretion when it excluded expert testimony by Dr. Cheng.

### 1. Background

Cabrera brought an in limine motion to exclude Dr. Cheng's testimony on the grounds that a biomechanical engineer was not qualified to testify as to medical causation of injury, the biomechanical methods used by Dr. Cheng did not meet the *Kelly*[3] standard, and this evidence was substantially more prejudicial than probative. Defendants argued that biomechanics was not a technique or experiment and thus the *Kelly* standard did not apply. They also argued that Dr. Cheng was qualified to testify that there were insufficient forces during the accident to produce Cabrera's injury and to compare the forces causing Cabrera's injury to the forces of activities in daily living. Following

---

[3] *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*), abrogated by statute on another point as explained in *People v. Wilkinson* (2004) 33 Cal.4th 821, 845-848.

8

argument on the motion, the trial court held an extensive hearing pursuant to Evidence Code section 802.[4]

Dr. Cheng had bachelor's and master's degrees in mechanics and structures from University of California at Los Angeles, and a Ph.D. in structural engineering and structural mechanics from University of California at Berkeley. Dr. Cheng also completed a post-doctoral fellowship at Los Alamos National Lab in the theoretical biology division. Dr. Cheng worked at Failure Analysis Associates for 10 years in the accident reconstruction and biomechanics area and at FTI for two years in the biomechanics area. He then started his own firm Applied Biomechanics where he had been working for the last 14 years. This firm specialized in accident reconstruction and biomechanics. Dr. Cheng also had another firm, which he formed a year ago. He collaborated with faculty members at University of California at San Francisco and University of California at Berkeley, physicians, and mechanical engineers to study human body motions to find ways to improve health and fitness.

Dr. Cheng's expertise in biomechanical engineering with respect to forces on a body in automobiles was acquired through on-the-job training, attendance at seminars, and research. He explained: "I've done research and collaborated with UCSF to . . . do a study on correlating computer models of a dis[c]-to-tissue deformation. I've done studies on occupant dynamics and simulations of that to correlate with crash testing. And specifically I've done crash testing on -- involving rear-end collision." He published several papers on head injuries and was currently working on impacts on pedestrians. His article on computer simulation in low-speed rear-end collision had just been accepted for publication.

---

[4] Evidence Code section 802 provides in relevant part: "The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based."

Dr. Cheng had testified as an expert witness in approximately 100 trials. He had testified not only in California, but also in other jurisdictions. Most of this litigation involved motor vehicle accidents and "probably a third" of these cases involved rear-end collisions. According to Dr. Cheng, "oftentimes the injury complaints mostly are the neck, and -- but low back complaints is common in litigation that lead to trial."

Dr. Cheng explained that accident reconstruction involves the application of the laws of physics and mechanics to study how an accident happened. He described biomechanics as "an application of mechanics, of studying the biological tissues in terms of how tissues move and how much forces are imposed on the tissue when forces are imposed on it. And in addition, you want to study how those forces are related to the well being of the tissue, meaning, you know, does it tear; does it deform; in what way does it deform; what kind of force would cause a certain tissue to perform in a certain way."

Dr. Cheng reviewed answers to interrogatories, deposition testimony, Cabrera's medical records, photos of the vehicles, and vehicle repair estimates in the present case. His biomechanical analysis for the accident involved three steps. First, he determined the forces operating on the vehicles. Dr. Cheng calculated the "delta V" which is the change of speed at impact. In Dr. Cheng's opinion, Cabrera's truck was pushed forward about 10 to 12 miles an hour in one-tenth of a second. Second, he determined how these forces affected the lumbar spine. Dr. Cheng opined that an impact that causes a delta-V of 10 to 12 miles per hour is not severe enough to alter the anatomical structure of the lumbar spine, that is, cause a herniated disc. Third, he compared the forces on the lumbar spine in the accident and compared it to known thresholds for causing certain types of damage based on cadaver testing. Dr. Cheng gave his opinion that "those forces acting on the lumbar spine were comparable to forces that the lumbar spine experiences, and are actually below known lumbar spine injury threshold."

10

Dr. Cheng relied on cadaver studies to determine "what kind of force and how much force would it take to produce . . . a disc prolapse" or disc herniation in the lower back. According to Dr. Cheng, "dummy design and crash testing is an accepted approach to study how much forces are imparted on an occupant for a given crash, so this is well accepted in the community." Dr. Cheng testified, "And if you look at all the crash tests, all of the low back forces, they are all very low, they're in the one to 200-pound range inertially. Of course, our low back has your upper body weight to start with so you have to start with -- for a 160-pound person is about less than a hundred pounds. [¶] So I'd say the low back forces in total in a rear-end collision is probably two to 300 pounds, which is well within known tolerance threshold, strength, in the lumbar spine, and certainly that -- those types of forces are being imposed on a body all the time in everyday situations." In his view, it would be difficult for a rear-end collision to produce a lower lumber disc herniation or prolapse, because this type of injury is caused by compression and hyperflexion, which is bending forward more than 60 degrees, and hyperflexion does not occur when a seat-belted driver is struck from behind. In reaching this conclusion, Dr. Cheng relied on specifications about Cabrera's seat back, information about seat belt performance, crash test data, and the physics of motion.

Dr. Cheng agreed that he was not qualified to provide a medical diagnosis, which would include medical causation of a particular injury on a particular person. However, he testified that he was qualified to provide a "biomechanical analysis of a production of a certain deformation to, say, a disc . . . ." When Cabrera's counsel asked Dr. Cheng whether he was "qualified to include causation of a particular injury on a particular person who may or may not have a particular status of their spine insofar as a preexisting condition . . . or may have other factors that would affect that particular person," he responded that he did not give medical causation opinions. Dr. Cheng also noted that some of the studies involved a range of degenerative conditions but excluded the "worst

11

cases." Thus, Dr. Cheng thought he was "able to draw conclusions on what force versus what outcome." However, he had not studied the extent of the degeneration in Cabrera's spine as compared to the amount of degeneration in the studies that he had relied upon. He also noted that the studies "span different grades of degenerative conditions."

Dr. Cheng testified: "And I am saying that, therefore, the disc prolapsed or, you know, the condition of the disc was not the result of the accident. [¶] By saying all that, I am not talking about medical causation because, you know, someone who had or had not had a condition before the accident, what kind -- how much time would it take for someone to recover, would this exacerbate someone's pre-existing condition, I'm not addressing any of that, those are medical testimony." Dr. Cheng again distinguished his opinions from those of a medical doctor: "Well, I first off -- I am not saying that because I saw the accident and the crush that whether the person was injured or not. Injury ultimately incorporates symptomatology. I am being very focused on only certain portions of it. I'm talking about forces. Even if the forces were comparable or lower than forces that are not known to produce injuries, there's really the muscular components, the exacerbation of issues that would not allow me to say, or anybody using engineering principles, to say whether a person's condition was exacerbated or not. It's really a medical issue. So I'm not aware of any literature that says given this vehicle, given such a condition, whether one would be exacerbated or not."

Dr. Cheng explained further: "I am testifying about two things, the forces acting on the spine in the accident, and I gave the meaning to that, how much force, what that force means, so that's number one. [¶] And because that's the same kind of force that you would experience from doing other things, I don't believe that -- and those are not hard-labor related activities, they are simpler, some -- like 300 pounds can be generated with not a laborious effort, so I'm saying that based on that, the force is definitely less. [¶] And to -- in addition to that, I'm talking about the mechanics that is known to

12

produce disc herniation or disc prolapse, and [within] that, then I'm saying that in looking at the rear-end collision, the body is not subjected to hyperextension in combination with compression, therefore the body is not subjected to the load that would explain the disc condition. [¶] Could somebody have been having complaints from that for whatever reason? I'm not here to talk about that, so I'm not really talking about medical causation. I'm just specifically focused on the force and the issue on the disc."

After taking the matter under submission, the trial court ruled as follows: "[I]f Dr. Cheng wishes to testify regarding the accident reconstruction, he may do so; [¶] If he wishes to testify regarding the impact severity, the change of speed 10 to 12 miles per hour, he may do so; [¶] He will not be allowed to testify regarding the 10 to 12 miles per hour force would not affect the lumbar spine; [¶] He will not be able to testify regarding that this force on the lumbar spine is below the known injury threshold; [¶] And he will not be allowed to testify regarding the activities of daily living that are the equivalent of this 10 to 12 miles per hour speed. [¶] The Court believes that there is inadequate medical basis for some of these decisions, they are more prejudicial than probative, and in some ways simply . . . aren't helpful to the jury."

## 2. Analysis

Defendants contend that the trial court erred when it excluded some of Dr. Cheng's opinion testimony.

Evidence Code section 720 provides that a person may testify as an expert "if he has special knowledge, skill, experience, training, or education sufficient to qualify him," which "may be shown by any otherwise admissible evidence, including his own testimony." (Evid. Code, § 720, subds. (a) & (b).) The California Supreme Court has recognized that "[q]ualifications other than a license to practice medicine may serve to qualify a witness to give a medical opinion." (*People v. Catlin* (2001) 26 Cal.4th 81,

13

131, overruled on another ground in *People v. Nelson* (2008) 43 Cal.4th 1242, 1253-1256.)

"Except to the extent the trial court bases its ruling on a conclusion of law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion. [Citations.] A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.] But the court's discretion is not unlimited, especially when, as here, its exercise implicates a party's ability to present its case. Rather, it must be exercised within the confines of the applicable legal principles." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

Defendants argue that the trial court excluded Dr. Cheng's opinions on the ground that they were medical opinions that Dr. Cheng was not qualified to offer because he was not a medical doctor.

We disagree with defendants' characterization of the record regarding the basis for the trial court's ruling. Here, the trial court asked defendants' counsel during the hearing to set forth how Dr. Anderson's testimony related to Dr. Cheng's testimony. Defendants' counsel stated that Dr. Anderson would address his medical examination of Cabrera, his review of Cabrera's medical records, and render his opinions and findings, but he would not offer opinions with respect to a biomechanical analysis. When the trial court asked if Dr. Anderson was going to rely on Dr. Cheng's testimony in reaching his conclusions, defendants' counsel responded that Dr. Anderson reviewed Dr. Cheng's "deposition testimony and the attached material as part of [his] work in this case, so he considers it as a part of his work. I -- I'll leave it at that." The trial court found this response "a little too vague . . . ." The trial court continued: "The difficulty I'm having is it seems to me that Dr. Cheng can testify about accident reconstruction. . . . [¶] It seems to me that he can also testify as to the delta V. Now, it seems to me that what he can't do is go beyond

14

that and testify about -- and say and basically give what I think is a medical conclusion, and that is that ten to 12 miles per hour force would not affect the lumbar spine, and -- I mean, I think that's a critical conclusion that I don't see how he can -- he can -- how he has qualifications to make that statement. [¶] And then the forces, his third opinion was forces on the lumbar spine fall below the known injury threshold. I'm not comfortable with that conclusion either, just because I think there's a lot more to it than coming up with the numbers that he's come up with and reaching that kind of conclusion from that. It seems to me a generality that should not be allowed in a -- in testimony in a particular case. [¶] So that -- that's sort of my thoughts on this, but I was trying to understand -- well, one, obviously Plaintiff needs an opportunity to meaningfully cross-examine Dr. Cheng, but I wanted everybody to know where I'm headed with this so that we're not wasting a lot of time. But what's unclear to me is how Dr. Anderson fits into all this."

The trial court later commented: "I listened to [Dr. Cheng's] testimony, and I'm having trouble understanding how he as someone who is not a medical doctor can reach the conclusion that this amount of force did not affect Tony Cabrera's lumbar spine." The trial court also stated: "I'm concerned about Dr. Cheng -- I'm not concerned about his expertise in accident reconstruction, I'm not concerned about his expertise, you know, in terms of figuring out the impact, the delta V, all of that, he seems qualified for that. I am concerned about his ability to then reach a conclusion as to how this impact affected Tony Cabrera."

In asking these questions and making comments, the trial court was not ruling that Dr. Cheng could not testify because he was not a medical doctor. Instead, the trial court was seeking to direct the focus of the hearing regarding the relevant issue in the present case, that is, the cause of Cabrera's injuries rather than causation as to the general population. In ruling on the admissibility of some of Dr. Cheng's testimony, the trial court concluded that there was "inadequate medical basis for some" of his opinions. The

15

trial court later stated: "Just let me add one other comment. I have allowed testimony in other trials on biomechanics, and I think that it is possible to qualify an expert to speak on biomechanics, but I believe that Dr. Cheng did not have the qualifications to support the conclusions that he was offering." Thus, the record does not reflect that the trial court excluded some of Dr. Cheng's testimony on the ground that he was not a medical doctor.

Defendants also contend that Dr. Cheng's "testimony about the *mechanism* of injury in an accident is not medical testimony, which focuses on the *diagnosis* of injury." They assert that "Dr. Cheng was being offered solely to provide biomechanical opinions, not medical opinions."

California courts, including the trial court in prior cases, have admitted biomechanical expert testimony, though no published California opinion has considered the admissibility of such evidence. (See, e.g., *DePalma v. Rodriguez* (2007) 151 Cal.App.4th 159, 161 [biomechanics expert "opined at trial that one would not expect the accident to result in the specific knee and shoulder injuries complained of because the 'forces are very comparable' to what would be experienced during normal 'routine activities'"]; *Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1153 [biomechanics expert calculated the forces in a motor vehicle accident and compared them to "'hopping off a six-inch curb'" or "'plopping into an office chair'"].)

However, in *Laski v. Bellwood* (6th Cir., May 25, 2000, No. 99-1063) 2000 WL 712502 (*Laski*),[5] the plaintiff argued that the trial court abused its discretion in allowing

---

[5]    Cabrera objects to defendants' citation to unpublished federal court opinions. However, California Rules of Court, rule 8.1115, subdivision (a) states, in relevant part, that "an opinion of a California Court of Appeal or superior court appellate division that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action." Thus, "[u]npublished federal opinions are '"citable notwithstanding California Rules of Court, rule [8.1115] which only bars citation of unpublished *California* opinions."'" (*Haligowski v. Superior Court* (2011) 200 Cal.App.4th 983, 990, fn. 4.)

16

the biomechanical expert to testify that the rear-end collision did not cause the plaintiff's back injuries. (*Id.* at p. *3.) *Laski* held that the expert witness's testimony "as to the forces necessary to produce certain types of back injuries, and the forces at work in a rear-impact car accident, considering a driver's position at the moment of impact, the speed of the car which struck the drivers, and many other factors" "falls squarely within the allowable biomechanical testimony" and thus was properly admitted. (*Id.* at p. *4.) *Laski* also noted that the expert's testimony that "he did not believe the condition shown in [the plaintiff's] second MRI was the result of the 1993 accident" was "arguably" improper. (*Ibid.*) However, the Court of Appeals concluded that any error was harmless due to the admissible evidence reflecting the expert's beliefs regarding the accident. (*Ibid.*)

Here the trial court concluded that there was an "inadequate medical basis for some of these decisions, they are more prejudicial than probative, and in some ways simply . . . aren't helpful to the jury." The record before us supports the trial court's ruling. As Dr. Cheng repeatedly acknowledged, he was not qualified to provide a medical diagnosis or medical causation opinions. As Dr. Cheng explained, "[e]ven if the forces were comparable or lower than forces that are not known to produce injuries, there's really the muscular components, the exacerbation of issues that would not allow me to say, or anybody using engineering principles, to say whether a person's condition was exacerbated or not. It's really a medical issue. So I'm not aware of any literature that says given this vehicle, given such a condition, whether one would be exacerbated or not." Since the issue for the jury in the present case was whether the motor vehicle accident caused Cabrera's injuries, the trial court reasonably concluded that Dr. Cheng was not qualified to give an opinion on that issue. His generalized testimony as to the force affecting the lumbar spine and that this force was below the known injury threshold and equivalent to the activities of daily living was only marginally relevant, because it

17

did not take into consideration the condition of Cabrera's spine. Thus, as the trial court found, the proffered expert testimony was not helpful to the jury. Based on this record, the trial court did not abuse its discretion in excluding some of Dr. Cheng's testimony.

However, even assuming that the trial court abused its discretion in excluding the evidence, there was no prejudice.

The California Constitution states that "[n]o judgment shall be set aside, . . . in any cause, on the ground . . . the improper admission or rejection of evidence, . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Our Supreme Court has explained that " 'a "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.] 'We have made clear that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 (*Cassim*).)

Here, in their arguments to the jury, the parties agreed that there were degenerative changes in Cabrera's spine prior to the accident. The central issue was whether Cabrera's injuries were caused or exacerbated by the motor vehicle accident. Cabrera testified that he experienced "major back pain" as a result of the accident and he was never able to return to work as a carpenter due to this injury. Dr. Quinn concluded that the accident was the cause of Cabrera's injury, because his symptoms began after the accident and had continued since the accident. Dr. Suri opined that the accident was the cause of the degeneration of the disc at the L5-S1 level. In Dr. Watson's opinion, Cabrera had a preexisting degenerative disc disease which was exacerbated by the accident.

18

Defendants' medical experts disputed this evidence. Dr. Schick concluded that Cabrera's chronic degenerative disc disease at the L5-S1 level was present before the accident. According to Dr. Anderson, Cabrera had extensive degenerative process in his lumbar spine prior to the accident and he suffered only soft-tissue injuries as a result of the accident. As Dr. Cheng acknowledged, he was not qualified to provide a medical diagnosis or medical causation of a particular injury on a particular person, including whether an individual's prior condition would have been exacerbated by the accident. Thus, it is not reasonably probable that the jury would have found in favor of defendants if his generalized testimony had been admitted.

Defendants also argue that the trial court compounded its error by precluding their medical expert from offering an opinion about whether the force of the accident could have caused Cabrera's injuries.

Dr. Anderson testified that Cabrera did not sustain an injury to the L5-S1 disc as a result of the accident. He based his opinion on several factors: "The changes that you see on the lumbar MRI, as I said, are clearly prior and degenerative in nature and not the result of a single event, so they would have -- the MRI scan probably would have looked the same if it had been done the week before the accident. There's no indication that there was any injury in that. [¶] And also the description of the accident given to me by Mr. Cabrera, the fact that he was restrained with a three-point seat belt, and that his back was against the seat, and the impact was from behind, as a neurosurgeon I would not expect this to result in any significant lumbar injury. These are not the types of forces that cause ---" The trial court granted the motion to strike as to the word "forces."

Defendants argue that "[i]f [Dr. Anderson's] opinions about the forces involved in the accident and how those forces would have been expected to affect Cabrera were outside the scope of his expertise, such opinions were clearly within the scope of Dr. Cheng's expertise." (Italics omitted.) However, defendants acknowledge that they

19

informed the trial court prior to trial that Dr. Anderson would not be offered as a biomechanical expert and he would not "be used to buttress Dr. Cheng's opinion." Thus, the trial court did not err in striking the reference to "forces" in Dr. Anderson's testimony as to the basis for his opinion that the accident did not cause injury to Cabrera's disc.

Defendants also contend that the prejudice was compounded when "Cabrera's counsel exploited the limitation on Dr. Cheng's testimony by taking Dr. Cheng's delta V calculation and then doing her own 'math' to calculate the forces Cabrera experienced in the accident."

Cabrera's counsel argued: "You didn't hear any evidence that the size of the accident made a difference in whether or not this accident caused Mr. Cabrera's injuries. In fact, there's some kind of interesting information that I'd like to talk to you about with . . . Dr. Cheng's testimony. You heard how he reconstructed the accident. He looked at pictures. He compared it to other things. He made certain assumptions. And even then he came up with the delta V, what he calls the change of speed, of at least ten to 12 miles an hour. He also testified that that change of speed occurred in .10 seconds. That's not a very long period of time. That's a very high acceleration rate. [¶] Now, we've all heard about things like when you hear car ads, and they say it's zero to 60 in eight seconds, I think we're all familiar with that. Depending on the car, some are faster, some are slower. I think they're supposed to try to make you buy a car based on that. So if we convert mathematically, and it's just easy math, if this . . . pickup that Tony was in got to 12 miles an hour within .10, that's a certain acceleration rate. That's zero to 12 in .10. If we kept on that same acceleration math -- rate and did the math, .10 goes into eight seconds 80 times. If you take 80 and you multiply it by 12, so that means the acceleration rate that this young man experienced in the vehicle -- his vehicle experienced, he would have been at 960 miles an hour." The trial court overruled the objection by defendants' counsel and stated, "It's argument."

20

Here, there was no evidence that the acceleration rate of Cabrera's truck was 960 miles an hour. Instead, Dr. Cheng testified that he used formulas to calculate the change of speed. He listed some of the factors in these calculations, but did not set forth the formulas in his testimony.

Absent a contrary indication in the record, this court presumes that jurors understand and follow instructions by the trial court. (*Cassim*, *supra*, (2004) 33 Cal.4th at pp. 803-804.) Here, the trial court instructed the jury that it "must decide the facts based on the evidence admitted in this trial." It also instructed the jury: "What the attorneys say during the trial is not evidence. In their opening statements and closing arguments, the attorneys have talked to you about the law and the evidence. What the lawyers have said may help you understand the law and the evidence, but their opening statements and arguments are not evidence." Since there is no indication in the record that the jurors did not follow the instructions, we must presume that they decided the facts based on Dr. Cheng's testimony and not Cabrera's counsel's mischaracterization of the evidence. Accordingly, we reject defendants' contention of prejudice.[6]

### B. Sufficiency of the Evidence

Defendants next argue that there was insufficient evidence to support the award of $200,000 in future medical costs.

---

[6] Defendants also assert that Cabrera's counsel violated the "golden rule" in her arguments. (*Cassim*, *supra*, 33 Cal.4th at pp. 796-798; *Loth v. Truck-A-Way Corp.* (1998) 60 Cal.App.4th 757, 765.) Cabrera's counsel argued that the jury should calculate pain and suffering based on "how much would you have to pay to have an agreement to endure [Cabrera's] pain," suggesting "[w]ould somebody do it for $70 a day," "[w]ould somebody do it for $75 a day," "[w]ould somebody do it for $80 a day," or maybe "it would cost more." However, defendants failed to object to these statements and thus forfeited this argument on appeal. (*Avalos v. Perez* (2011) 196 Cal.App.4th 773, 776-777.) Moreover, this argument was irrelevant to the issue of causation.

21

Dr. Anderson, defendant's expert witness, testified in deposition that lumbar surgery would cost between $150,000 and $200,000 based on the "charts" that he had reviewed. Defendants objected to Cabrera's request to read Dr. Anderson's deposition testimony to the jury. They also requested a five-minute hearing under Evidence Code section 402 to explore the foundation for Dr. Anderson's opinion that future surgery could cost as much as $200,000. The trial court denied the request and stated: "Obviously if you want to ask your witness questions about his expertise when he's on the stand, you can do that."

Defendants first claim that Dr. Anderson's opinion was inadmissible, because his "deposition testimony was a response to a question by Cabrera's counsel about whether Dr. Anderson agreed with Dr. Watson's opinion—which was admittedly a guess—that a lumbar surgery would cost about $75,000" and "Dr. Anderson's testimony was no less speculative than Dr. Watson's and should have been likewise excluded."[7] This claim is not supported by the record. Cabrera's counsel asked Dr. Anderson, "Do you have any opinion or knowledge with respect to how much the surgery would cost that Dr. Watson discussed in his report?" Dr. Anderson responded: "And that depends on what part of northern California you're in. In the San Francisco area, that procedure runs about 75 to a hundred thousand dollars. In Sacramento, in Modesto, it runs anywhere from 150 to 200 thousand dollars. . . . I think Fresno is more in the line with the San Francisco area from the charges that I've seen in charts."

Citing Evidence Code section 801, subdivision (b), defendants assert that Dr. Anderson was not relying on the types of materials on which a medical costs expert would reasonably rely before reaching an opinion.

---

[7] The trial court precluded Dr. Watson from testifying about future surgery costs, because he testified that his opinion on these costs was a "guesstimate."

Evidence Code section 801 states in relevant part: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] . . . [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

Here, after retiring from Kaiser Hospital in 1998, Dr. Anderson began working solely as a consultant in worker's compensation and personal injury cases. He had been working exclusively as a consultant on personal injury cases since 2001. During this latter period, he reviewed records, evaluated patients, gave his opinion, and earned approximately $334,800 per year. Dr. Anderson explained the basis for his opinion on the costs of future surgery for Cabrera: "What they're based on is since I retired from practice, I've reviewed quite a few cases, and in those reviews, there are sometimes costs for proposed operations or even operations that have actually been done." As a medical expert in neurosurgery and a consultant on personal injury cases, Dr. Anderson possessed special knowledge and experience and thus was qualified to testify regarding Cabrera's future medical expenses.

Relying on *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308 (*Corenbaum*), defendants contend that "there was no foundation for Dr. Anderson's testimony that charges he saw on charts had any relationship to the amounts actually paid for those services."

*Corenbaum* held that the amount that a medical provider billed a plaintiff for medical care was not relevant to a determination of the plaintiff's economic damages for past medical care. (*Corenbaum*, *supra*, 215 Cal.App.4th at pp. 1318, 1330.) *Corenbaum*

23

explained that "there can be significant disparities between the amounts charged by medical providers and the costs of providing services and that the price of a particular service can 'vary tremendously . . . from hospital to hospital in California' and 'a medical care provider's billed price for particular services is not necessarily representative of either the cost of providing those services or their market value.'" (*Id.* at p. 1330, quoting *Howell* [*v. Hamilton Meats & Provisions, Inc.* (2011)] 52 Cal.4th [541,] 560-562, 564.) For the same reason, *Corenbaum* also held that the amount that a medical provider billed a plaintiff for past medical services was not relevant to a determination of damages for future medical expenses. (*Corenbaum*, at p. 1331.)

Unlike in *Corenbaum*, Cabrera's past medical expenses did not serve as the basis for Dr. Anderson's opinion. Instead, Dr. Anderson relied on records that he had reviewed in his capacity as a consultant in personal injury cases. Assuming that *Corenbaum* applies to the present case, we find no error in the admission of Dr. Anderson's testimony. Dr. Anderson referred to both the "costs" of the surgery and the "charges" in the records. Defendants do not provide a citation to the record in which they questioned Dr. Anderson about the documents that he had reviewed and clarified whether his opinion was based on the costs of providing the medical services or the amounts that the medical provider agreed to accept from the insurer as full payment or the full amount billed by the medical providers. Thus, this court cannot assume that Dr. Anderson's testimony was inadmissible.

We next consider whether there was substantial evidence to support the award of $200,000 for future medical expenses. "Our consideration of the issue whether the judgment was supported by substantial evidence is governed by the well-established standard of review applicable to any claim that a judgment or finding is not supported by the evidence in the record. Under that standard, we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable

inference, and resolving conflicts in support of the judgment. [Citations.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.)

A plaintiff may recover damages for detriment "certain to result in the future." (Civ. Code, § 3283.) "However, the 'requirement of certainty . . . cannot be strictly applied where prospective damages are sought, because probabilities are really the basis for the award.' [Citation.] Still, ' " ' " 'there must be evidence to show such a degree of probability of their occurring as amounts to a reasonable certainty that they will result from the original injury' [Citations.]" ' [Citation.]" (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 533.)

Dr. Watson opined that Cabrera was a candidate for fusion surgery and that he would be a candidate for more than one surgery due to his young age. Dr. Watson explained that "for every year that goes by, you'd have a two percent chance of needing more surgery because by fusing one part of the spine, you're taking away some of the flexibility, so that means the other discs have to work harder and so for every year that goes by, there's a two percent chance that you may have something else done. And that's cumulative, that means ten years you've got a 20 percent, and 20 years you have a 40 percent chance of the possibility of something else needing be done. And at his young age, that would be a distinct possibility." Dr. Anderson disagreed with Dr. Watson's discussion regarding the need for a second surgery. According to Dr. Anderson, "it's 50 percent by the end of ten years that people have significant degenerative changes at the adjacent levels of fusions that require surgical intervention." Thus, it is more likely than not that Cabrera, who was 31 years old at the time of trial, would require a second surgery before he was 60 years old. The costs for two surgeries ranged from $150,000 to $200,000 in Fresno where Cabrera was currently living. Thus, the award of $200,000 in future medical expenses was supported by substantial evidence.

### III. Disposition

The judgment is affirmed.

_____

Mihara, J.

WE CONCUR:

_____

Bamattre-Manoukian, Acting P. J.

_____

Grover, J.

27